HOLLAND & KNIGHT
John Kern (CA State Bar No. 206001)
Jessica Lanier (CA State Bar No. 303395)
50 California Street, 28th Floor
San Francisco, California 94111
Telephone: (415) 743-6900
Facsimile: (415) 743-6910
Email: john.kern@hklaw.com
jessica.lanier@hklaw.com

Attorneys for CE RESOURCE, INC. *d/b/a* NetCE



UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

SACRAMENTO DIVISION

| | |
|---|---|
| CE RESOURCE, INC. *d/b/a* NetCE,<br><br>Plaintiff,<br><br>vs.<br><br>ELITE CONTINUING EDUCATION, INC., a Florida Corporation and Alpine Management Services III, LLC<br><br>Defendants. | Case No.: 2:15-cv-01908-WBS-AC (TEMP)<br><br>**PLAINTIFF'S AMENDED COMPLAINT FOR COPYRIGHT INFRINGEMENT, BREACH OF CONTRACT, TORTIOUS INTERFERENCE WITH CONTRACTUAL RELATIONS, UNFAIR BUSINESS PRACTICES UNDER CALIFORNIA BUSINESS & PROFESSIONS CODE § 17200 *et seq.*, and MISAPPROPRIATION OF TRADE SECRETS UNDER CALIFORNIA'S UNIFORM TRADE SECRETS ACT (CIVIL CODE § 3426 *et seq*).** |

Plaintiff CE RESOURCE, INC. *d/b/a* CME RESOURCE and NetCE (hereafter "NetCE" or "Plaintiff"), files this complaint against Defendants ELITE CONTINUING EDUCATION ("Elite") and Alpine Management Services III, LLC ("Alpine") (collectively, "Defendants"), and alleges as follows:

**PARTIES**

1. Plaintiff NetCE is a California-based corporation, with its principal place of business at 1482 Stone Point Drive, Suite 120, Roseville, California, 95661.

2. Defendant Elite is a business entity, with its principal place of business at 1452 North U.S. Highway 1, Suite 100, Ormond Beach, FL, 32174.

3. Defendant Alpine is a business entity, with its principal place of business at 3 Embarcadero Center, Suite 2330, San Francisco, CA 94111.

4. On information and belief, non-party "NurseCE4Less" is website owned by Health Inservice, Inc., a Butte, Montana company operating in the medical continuing education and training industry.

5. Non-party Dr. Jassin Jouria ("Dr. Jouria") is a doctor of medicine and author of medical education literature. On information and belief, he is not a practicing physician. Dr. Jouria resides in Florida. Dr. Jouria was named as a defendant in the original complaint. He has since filed for bankruptcy in the Southern District of Florida. Dr. Jouria has not applied to have a stay entered against him in the Eastern District of California. Dr. Jouria has, however, applied to have a stay entered against him in litigation (an anticipatory lawsuit) he filed ("Florida Litigation") in the United States District Court for the Southern District of Florida ("Florida Court"). The Florida Court ordered that a stay be put in place against Dr. Jouria in the Florida Litigation. This stay effectively mooted a pending motion to dismiss and motion to transfer filed by NetCE, pending before the Florida Court. Out of an abundance of caution, and a wish to avoid violating any automatic stay, NetCE has, at least for the time being, removed Dr. Jouria as a named defendant in this matter. NetCE reserves the right to re-allege its claims against Dr. Jouria if and when the stay is lifted or expires due to Dr. Jouria's inaction.

Holland & Knight LLP
50 California Street, 28th Floor
San Francisco, CA 94111
Tel: (415) 743-6900
Fax: (415) 743-6910

## JURISDICTION AND VENUE

6. This is an action for copyright infringement arising under the United States Copyright Act of 1976, 17 U.S.C. § 101 *et seq*. ("U.S. Copyright Act" or "Copyright Act"), breach of contract, tortious interference with contractual relations, violation of California's Unfair Business Practices

Holland & Knight LLP
50 California Street, 28th Floor
San Francisco, CA 94111
Tel: (415) 743-6900
Fax: (415) 743-6910

Statute (Cal. Bus. & Prof. Code §17200, *et seq.*), and misappropriation of trade secrets under California's Uniform Trade Secrets Act (Civil Code § 3426 *et seq.*).

7. This Court has original jurisdiction over the subject matter of this action under 35 U.S.C. §§ 1331, 1338. The actions for breach of contract, interference with contractual relations, unfair business practices, and misappropriation of trade secrets arise from the same transaction and/or occurrence and are a part of the same case and/or controversy as the claim for copyright infringement. Therefore, this Court has supplemental jurisdiction over this action under 35 U.S.C. § 1367.

8. Elite is subject to personal jurisdiction in California, because, upon information and belief, it purposefully avails itself of California law by offering continuing education programs and certification courses in California, to California residents, and to persons seeking qualification to practice various professions (dentistry, nursing, massage therapy, pharmacology, counseling, psychology, and social work) within California. In offering these courses, Elite must comply with California regulations as to licensure for a variety of professions. Moreover, Elite is subject to personal jurisdiction in California, because it interfered with a contract between Dr. Jouria and NetCE, a California-based company. Due to the breadth of its interaction with California, Elite is subject to personal jurisdiction therein.

9. Alpine is subject to personal jurisdiction in California because, upon information and belief, it conducts its business operations primarily out of its offices in San Francisco. Alpine is further subject to personal jurisdiction in California because it entered into a contract (a non-disclosure agreement, or "NDA") with NetCE, a California company. Upon information and belief, and according to its website, Alpine has also invested in a number of California-based companies. Alpine is subject to general personal jurisdiction in California.

10. Venue is proper in the Eastern District of California under 28 U.S.C. § 1391(b) because Plaintiff NetCE has its principal place of business there, and because a substantial part of the events giving rise to each of the Plaintiff's claims occurred within the Eastern District of California.

///

///

## FACTUAL BACKGROUND

**a. NetCE: Background, Contributing Faculty Members, and Freelance Writer Agreements**

11. NetCE is one of the nation's leading publishers of Continuing Medical Education ("CME") articles, content, and course materials. NetCE was founded 1991, and its target customers generally are healthcare professionals, including without limitation Nurses, Physicians, Dental Professionals, Social Workers, Counselors, and Psychologists.

12. NetCE is located in Roseville, California, and currently has 39 employees.

13. In order to develop the CME courses and materials it offers to its customers, NetCE contracts with independent authors (referred to in NetCE's marketing materials as its "Contributing Faculty Members"), almost all of whom are licensed medical professionals, credentialed medical scholars and academics, or both.

14. The Contributing Faculty Members who draft the CME course materials NetCE edits, markets, and publishes, do so under standard, template agreements (called "Freelance Writer Agreements"), identical---except for the name of the author, deadlines ("course completion dates"), and subject-matter areas---to the seven (7) contracts between NetCE and Jouria at issue in this case. Currently, NetCE is working with more than 80 Contributing Faculty Members under Freelance Writer Agreements.

15. Under the terms of the Freelance Writer Agreements, the Contributing Faculty Members agree, among other terms, to draft and submit to NetCE for editing and publication CME articles on a specific subject, in a specific format, and by a specific deadline. These Contributing Faculty Members also agree that the articles they submit to NetCE are "works for hire" and that all copyrights associated with these materials belong exclusively to NetCE.

16. Prior to accepting submissions from Contributing Faculty Members, NetCE presents Contributing Faculty Members with a document entitled "Faculty Guide to Activity Development" ("Faculty Guide"). The document lays out NetCE's national accreditation and describes NetCE criteria for content development. Page 8 of the Faculty Guide features a section called "Freelance

Holland & Knight LLP
50 California Street, 28th Floor
San Francisco, CA 94111
Tel: (415) 743-6900
Fax: (415) 743-6910

Writer Contract Highlights." This section states: "Upon the contributing faculty member's receipt of payment, the submitted activity becomes the sole property of NetCE. This will be copyrighted material. There is no guarantee made to the faculty member as to whether, when, or where the activity will be published."

17. The type of writer-publisher arrangement described above (including the timing of transfer of ownership of the work) is, in fact, quite common in the publishing industry.

18. At present, NetCE has federally registered copyrights for more than 840 CME articles and courses, as well as the catalogs and brochures associated with the CME materials. At the time this Complaint was initially filed, NetCE had pending federal copyrights (applications on file with the U.S. Copyright Office) for an additional 27 courses/articles (including for the seven (7) courses at issue). On November 30, 2015, NetCE received confirmation from the U.S. Copyright Office that the copyrights for six (6) of the seven (7) courses at issue are now federally registered, effective May 15, 2015. NetCE expects the receipt of the seventh certificate soon. A PDF of these certificates is attached as Exhibit A.

Holland & Knight LLP
50 California Street, 28th Floor
San Francisco, CA 94111
Tel: (415) 743-6900
Fax: (415) 743-6910

**b. Elite Continuing Educators**

19. On information and belief (and according to the Better Business Bureau), Elite Continuing Educators ("Elite") was founded in 1999, and maintains its principal place of business in Florida.

20. On information and belief, Elite began offering continuing education to nurses (and thus became a direct competitor to NetCE) around 2006-2007. Prior to this time, on information and belief, Elite published continuing education course primarily for cosmetologists.

21. On information and belief (and according to the information on its website), Elite currently offers approximately 60 CME courses for nursing professionals, including numerous courses authored by Dr. Jouria in the areas of pharmacology and internal medicine.

**c. Dr. Jassin Jouria**

22. On information and belief, Dr. Jouria is an M.D., who received his medical degree from Ross University School of Medicine ("RUSM"). RUSM is a private, for-profit medical school,

owned and operated by DeVry Education Group and located on the Island Nation of Dominica, in the Caribbean.

23. On information and belief, because he has not completed a residency, Dr. Jouria is not a licensed, certified, or practicing physician

24. In early 2013, Dr. Jouria approached NetCE with a proposal to work on a series of CME courses in the areas of general medical, internal medicine, and pharmacology.

25. At the time of Dr. Jouria's proposal, NetCE was looking to expand its course offerings in these areas in response to newly adopted CME requirements for nurses across the country, particularly in the areas of pharmacology and internal medicine.

26. As part of its normal diligence on prospective new contributors, NetCE performed online research to ensure that Dr. Jouria was not already working with any of its competitors to market and publish CME articles. Dr. Jouria confirmed in his discussions with NetCE that he was not working for any of NetCE's competitors.

27. NetCE and Dr. Jouria engaged in discussions which ultimately culminated in the parties entering into ten (10) separate Freelance Writer Agreements, under which Dr. Jouria would prepare draft CME articles in agreed upon areas (hereafter referred to as "Courses"), and NetCE would provide editing, publishing, and marketing services for the Courses. Prior to signing the Freelance Writer Agreements (and prior to submitting any content to NetCE), Dr. Jouria was provided with a copy of the Faculty Guide on April 6, 2012; he affirmatively and explicitly told NetCE that he had reviewed and understood the document and the process of submission.

28. Throughout 2012 and the early part of 2013, Dr. Jouria submitted drafts for each of the ten (10) Courses, and NetCE paid Dr. Jouria for each of the ten (10) Courses, pursuant to the terms of the respective Freelance Writer Agreements. At the time that payment was rendered to Dr. Jouria, pursuant to his contract and the terms of the Faculty Guide, ownership of the articles (including the seven (7) articles at issue) transferred to NetCE.

29. Ultimately, NetCE did publish and make available for its customers three (3) of Dr. Jouria's Courses, including (a) Course #98590, entitled "Multiple Sclerosis: A Comprehensive

Holland & Knight LLP
50 California Street, 28th Floor
San Francisco, CA 94111
Tel: (415) 743-6900
Fax: (415) 743-6910

Review," (b) Course #98810, entitled "COPD: An Overview of Pathophysiology and Treatment," and (c) Course #4885, entitled "Pressure Ulcers: Pathogenesis and Management." These three (3) Courses are not in dispute and are not the subject of this lawsuit.

**d. Alpine**

30. On information and belief, and according to their website, Alpine Investors is an investment firm founded in 2001 and maintains its principal place of business in San Francisco, California.

31. Alpine, according to its website, has invested in and helped cultivate roughly thirty companies in a variety of industries.

32. In early 2012, (described at greater length below) Alpine approached NetCE to discuss the possibility of purchasing the company. Upon information and belief, shortly after the proposed purchase and/or merger with NetCE did not come to fruition, Alpine approached Elite in a similar fashion.

**e. The Seven (7) At-Issue Agreements**

33. NetCE and Dr. Jouria entered into seven (7) additional Freelance Writer Agreements, which are at issue in this case. These agreements are attached as Exhibit B. Except for (a) the subject matter description of the Courses, (b) the deadlines for submission of draft Courses, and (c) the compensation NetCE was to pay Dr. Jouria for each Course---these seven (7) agreements were identical in their terms. The subject matter description of the Courses were:

1) The Lymphatic and Immune Systems;
2) Traumatic Brain Injury;
3) Nonantibiotic Antimicrobial Pharmacology;
4) Cardiovascular Pharmacology;
5) Gastroesophageal Reflux Disease;
6) Cancer and Chemotherapy; and
7) Depression vs. Dementia in the Elderly.

Holland & Knight LLP
50 California Street, 28th Floor
San Francisco, CA 94111
Tel: (415) 743-6900
Fax: (415) 743-6910

34. Each agreement made clear that the draft Courses were the property of NetCE and that NetCE was the author of each Course Dr. Jouria drafted related to the subject matter of the seven (7) agreements. NetCE paid Dr. Jouria for exclusive ownership and right of first refusal to publish the above articles.

**f. Complications with Publication**

35. After entering into the Freelance Writer Agreements, but prior to completion of the engagement, NetCE continued to collect background information relating to Dr. Jouria's credentials, and discovered some discrepancies. NetCE decided it would not enter into additional contracts or projects with Dr. Jouria.

36. As NetCE evaluated and revised Dr. Jouria's work, NetCE discovered the work had significant deficits in three major areas: medical/scientific accuracy, grammatical and stylistic, and plagiarism.

37. NetCE utilized a plagiarism detection program called "iThenticate" to identify areas that were copied (in essence or exactly) and then removed offending passages, and in some cases obtained the original author's permission to reprint them, prior to getting the works ready for publication. iThenticate revealed that the tables of information Dr. Jouria included with his submissions were almost always copied from original sources with no indication as to their author or source and never with permission to reprint.

38. At the time NetCE discovered Dr. Jouria's relationship with Elite, two of the NetCE courses--Gastroesophageal Reflux Disease and Cancer and Chemotherapy--were close to publication, with an estimated release date of March 1, 2015. The remaining five courses required significant editorial work, but were tentatively scheduled to be completed and released sometime in 2015.

39. The Gastroesophageal Reflux Disease and Cancer and Chemotherapy courses were close enough to publication that NetCE had paid for permission to reprint tables from the original copyright holders. (These tables appear in the Elite courses without attribution or permission.) NetCE expended a significant amount of time and effort locating the original sources for each of these tables, requesting permission to reprint the tables and paying reprinting fees to the copyright holder to do so.

Holland & Knight LLP
50 California Street, 28th Floor
San Francisco, CA 94111
Tel: (415) 743-6900
Fax: (415) 743-6910

40. NetCE paid an independently contracted editor a large sum to make significant improvements and substantive edits to the Cancer and Chemotherapy course.

41. The substantial amount of time spent by NetCE editorial staff developing the courses and related proposal not only cost NetCE money, but diverted time and resources from other, viable projects.

42. Physical resources were expended upon editing Dr. Jouria's ultimately unusable projects.

43. Dr. Jouria's publication with Elite prevented NetCE from featuring Dr. Jouria's courses in NetCE's direct mailings.

44. Because NetCE is unable to use the content Dr. Jouria submitted, Dr. Jouria and Elite's actions (including publication) set NetCE behind its competitors in offering courses in the above-described topics.

45. Lastly, upon information and belief, sales of Dr. Jouria's prior courses with NetCE may be depressed due to the high profile character of his relationship with Elite and customer confusion as to source.

**g. NetCE's Copyrights are Infringed Through Publication with Elite**

46. In February 2015, NetCE discovered that Dr. Jouria had materially breached seven (7) of the Freelance Writer Agreements, by publishing seven (7) articles (which he previously had submitted to NetCE) through one of NetCE's competitors, Elite.

47. These articles all fell within the subject matter areas of pharmacology and internal medicine--areas in which Elite, one of NetCE's chief competitors, had not previously published in a significant manner.

48. In fact, upon information and belief, Elite presently offers no other pharmacology courses aside from ones authored by Dr. Jouria.

49. Moreover, the majority of Elite's internal medicine and general medicine courses also are authored by Dr. Jouria.

Holland & Knight LLP
50 California Street, 28th Floor
San Francisco, CA 94111
Tel: (415) 743-6900
Fax: (415) 743-6910

50. In sum, Dr. Jouria's collaboration with Elite on the seven (7) course at-issue in the case represent a new and significant foray by Elite into an expansion of its CME offerings.

51. By publishing articles through Elite relating to the above-identified topics, Dr. Jouria materially breached the terms of the various Freelance Writer Agreements he signed with NetCE, including, without limitation, the following provisions: (1) §5(d) ("Writer will submit the Article to any other party for publication unless and until [NetCE] expressly rejects the Article . . ..") and (2) §9 ( "Writer hereby understands and agrees that all articles approved for publication by [NetCE] under this agreement shall belong exclusively to [NetCE] . . ." and . . ."Writer agrees that, to the maximum extent allowed by law, all such Articles shall be deemed to be 'works made for hire' under all relevant copyright laws, and [NetCE] shall be deemed to be the author thereof . . ..").

52. In the course of events leading up to and following the filing of this lawsuit, representatives from Elite acknowledged the offending content and made assurances that Elite had removed the infringing articles from its website and from availability through internet searches. As of this filing (December 16, 2015), each of the links to the seven (7) infringing articles remain live and available for purchase. At least *Cardiovascular Diseases: The Leading Cause of Death in Women*, (which is substantially similar to *Cardiovascular Pharmacology*) remains visible on the course list for nursing and available for purchase as a single course *and* bundled in Elite's "Special Package Pricing – 2015 Edition." As NetCE now has registered federal copyrights for the offending courses,[1] effective May 15, 2015, Elite's continued willful infringement entitled NetCE to attorneys' fees and statutory damages.

**h. NetCE's Copyrights are Infringed Through Publication with NurseCE4Less**

53. In August of 2015, NetCE discovered that Dr. Jouria had committed additional bad acts, this time with a NetCE competitor called "NurseCE4Less."

[1] NetCE has received certificates for six (6) of the seven (7) courses and expects to receive the seventh certificate any day now. (This certificate is for the course Dementia and Depression in the Elderly.)



Holland & Knight LLP
50 California Street, 28th Floor
San Francisco, CA 94111
Tel: (415) 743-6900
Fax: (415) 743-6910

54. On information and belief, NurseCE4Less is a website owned by Health Inservice, Inc., a Butte, Montana corporation operating in the medical continuing education and training industry.

55. Dr. Jouria's publication through NursesCE4Less constitutes a material breach of same provisions of four (4) of the Freelance Writer Agreements, as well an infringement of NetCE's copyrights in those 4 works.

56. Dr. Jouria had published substantially similar versions of articles owned by NetCE with a company called NurseCE4Less: "Traumatic Brain Injury," "Nonantibiotic Antimicrobial Pharmacology," "Cardiovascular Pharmacology," and "The Lymphatic and Immune Systems."

57. For NurseCE4Less, Dr. Jouria submitted paraphrased versions of NetCE courses "Nonantibiotic Antimicrobial Pharmacology" and "Cardiovascular Pharmacology" as "Antibiotic and Antimicrobial Pharmacology" in four (4) parts and "Cardiovascular Pharmacology" in three (3) parts. Some elements (tables and language) are reworked or removed in these infringing NurseCE4Less publications, but the outline and stated learning objectives are identical to the copyrighted NetCE courses. This constitutes substantial similarity.

58. In breach of the pertinent Freelance Writer Agreements, Dr. Jouria also submitted articles titled "Lymph Nodes & Cancer" in two (2) parts and "Trauma Series: Head Trauma" to NurseCE4Less. These two articles copy significant sections from NetCE articles "The Lymphatic and Immune Systems" and "Traumatic Brain Injury," respectively. This, too, constitutes substantial similarity.

59. By publishing articles through the NurseCE4Less website, which are based and relate to the above-identified topics, Dr. Jouria has infringed on NetCE's copyrights and materially breached the terms of the various Freelance Writer Agreements he signed with NetCE, including, without limitation, the following provisions: (1) §5(d) ("Writer will not submit the Article to any other party for publication unless and until [NetCE] expressly rejects the Article . . ..") and (2) §9 ("Writer hereby understands and agrees that all articles approved for publication by [NetCE] under this agreement shall belong exclusively to [NetCE] . . ." and . . ."Writer agrees that, to the maximum

Holland & Knight LLP
50 California Street, 28th Floor
San Francisco, CA 94111
Tel: (415) 743-6900
Fax: (415) 743-6910

extent allowed by law, all such Articles shall be deemed to be 'works made for hire' under all relevant copyright laws, and [NetCE] shall be deemed to be the author thereof . . ..").

60. Upon information and belief, NurseCE4Less published these articles throughout 2014 and 2015. After counsel for NetCE contacted NurseCE4Less and notified them of the infringing character of the content, NurseCE4Less removed the courses from circulation.

**i. Alpine and Elite Misappropriated Information They Knew Or Should Have Known Was Proprietary and Confidential to NetCE**

61. In early 2012, Alpine approached NetCE to discuss a potential acquisition. NetCE and Alpine engaged in communications and negotiations on this subject over a several month period, throughout 2012. The negotiations included several days of in-person meetings among NetCE and Alpine representatives and certain authorized parties.

62. During the course of these discussions, and in order to evaluate the feasibility and desirability of an acquisition and sale, the parties agreed to exchange proprietary information. Accordingly, Alpine and NetCE executed a mutual non-disclosure agreement ("NDA") in July of 2012.

63. Pertinent portions of the agreement include:

- "…[NetCE] is willing to furnish [Alpine]… with certain information about its business that includes information which is either non-public, confidential or proprietary in nature."
- "The Information [shared by NetCE] will be kept confidential and shall not, without prior written consent of [NetCE], be disclosed by [Alpine] or its Representatives, other than in connection with the transaction between the parties or as permitted herein.…[Alpine] *shall not transmit the Information to any third parties*, including any agents or contractors." (emphasis added.)
- "This agreement, and all obligations herein, will terminate at the earlier to occur of (i) three years from the date hereof and (ii) the consummation of a definite agreement with respect to the transaction."

64. During the course of negotiations--in an effort to provide Alpine with information it claimed was necessary to evaluate its valuation of NetCE--NetCE produced significant, non-public

Holland & Knight LLP
50 California Street, 28th Floor
San Francisco, CA 94111
Tel: (415) 743-6900
Fax: (415) 743-6910

information to Alpine, including without limitation its market strategies, industry reports, financial performance data, and generally proprietary information concerning the type of content NetCE furnished, developed, and was planning to develop.

65. At all relevant times, the NDA was in place, and NetCE operated with the belief that it was fully protected by the terms of that agreement.

66. During 2012 and 2013, Dr. Jouria signed agreements with NetCE, including the seven (7) Freelance Writer Agreements at issue. In fact, during its negotiations with Alpine, NetCE made Alpine aware of the identity of its existing faculty and shared drafts of Dr. Jouria's work with Alpine. NetCE also shared other information with Alpine related to courses that had been developed or were in development.

67. In late 2012, NetCE terminated its discussions with Alpine, as the parties were unable to reach mutually satisfactory terms. Roughly a year thereafter, NetCE discovered that Alpine had--shortly after NetCE ceased its discussions with Alpine---purchased Elite.

68 Upon information and belief, after Alpine acquired Elite, Elite hired Dr. Jouria as a physician author and planner. Upon information and belief, this was a new position, one that Elite had not advertised or held. Shortly after Alpine's Elite acquisition, Elite rapidly and aggressively moved into the medical and pharmacologic space.

69. Given Elite's subsequent relationship with Alpine, Elite's relationship with Dr. Jouria, and the timing of offering continuing education on the subject matter at issue in this lawsuit, Elite's awareness of NetCE's association with Dr. Jouria gave rise to Elite's duty to vet any submissions by Dr. Jouria in order to ensure he was submitting original material. Upon information and belief, Alpine and Elite impermissibly used the confidential and proprietary knowledge Alpine

Holland & Knight LLP
50 California Street, 28th Floor
San Francisco, CA 94111
Tel: (415) 743-6900
Fax: (415) 743-6910

obtained from NetCE under the NDA and then wrongfully passed this information along to Elite to give Elite a competitive advantage in the marketplace.

70. Alpine knew the information was proprietary and confidential and that disclosing the information to additional parties without NetCE's permission was improper. Elite knew or should have known that the information regarding NetCE that it obtained from Alpine was confidential and proprietary and that its acquisition and use of the information was improper.

## CLAIMS FOR RELIEF

### CLAIM ONE: COPYRIGHT INFRINGEMENT
(Against Elite Continuing Education)

71. NetCE hereby repeats and re-alleges each and every allegation contained in Paragraphs 1-70 as if fully set forth herein.

72. Each of the articles Dr. Jouria submitted to NetCE pursuant to the Contracts is registered with the United States Copyright office, registration effective May 15, 2015. or is the subject of a completed application for copyright registration with the same. See Exhibit A.

73. Pursuant to the terms of the Contracts, the work for hire doctrine, and the registrations issued by the United States Copyright office, NetCE is the sole author and lawful owner of the copyright for the articles Dr. Jouria submitted to NetCE. As such NetCE has the exclusive right to copy, reproduce, and distribute copies of the articles or derivative works thereof.

74. Neither Elite (nor, for that matter, Dr. Jouria) obtained permission from NetCE to republish, reissue, resubmit, or otherwise license the articles, identical versions of the articles, or substantially similar versions of the articles covered by the Contracts.

75. Elite infringed NetCE's copyrights by publishing the articles Dr. Jouria submitted to NetCE pursuant to the terms of the Contracts. Elite continues to infringe NetCE's copyright by refusing to make the offending content unavailable to consumers and the public.

///

///

Holland & Knight LLP
50 California Street, 28th Floor
San Francisco, CA 94111
Tel: (415) 743-6900
Fax: (415) 743-6910

Holland & Knight LLP
50 California Street, 28th Floor
San Francisco, CA 94111
Tel: (415) 743-6900
Fax: (415) 743-6910

**CLAIM TWO: BREACH OF CONTRACT**
(Against Alpine)

76. NetCE hereby repeats and re-alleges each and every allegation contained in Paragraphs 1-75 as if fully set forth herein.

77. NetCE entered into a valid and enforceable NDA with Alpine.

78. The NDA between Alpine and NetCE contained express prohibitions against sharing NetCE's proprietary and confidential information with unauthorized third parties.

79. NetCE performed all of its obligations under the NDA.

80. Alpine breached its obligations under the NDA by sharing NetCE's confidential and proprietary information with, at least, Elite. NetCE did not give Alpine permission to share this information.

81. As a result of each and all of these breaches, NetCE has been damaged in an amount to be proven at trial.

**CLAIM THREE: TORTIOUS INTERFERENCE WITH CONTRACTUAL RELATIONS**
(Against Elite Continuing Education and Alpine)

82. NetCE hereby repeats and re-alleges each and every allegation contained in Paragraphs 1-81 as if fully set forth herein.

83. NetCE and Elite are competitors in the field of continuing professional educational services and materials.

84. The Contracts between Dr. Jouria and NetCE. The NDA between Alpine and NetCE are valid and enforceable.

85. Upon information and belief, Elite was aware of Dr. Jouria's agreements with NetCE ("Contracts") and of NetCE's NDA with Alpine.

86. Elite intentionally interfered with the contracts between Dr. Jouria and NetCE by soliciting and publishing articles identical or substantially similar to articles Dr. Jouria submitted to NetCE. Pursuant to the terms of the Contracts, these articles were the property of NetCE. In soliciting

and publishing articles that were properly the property of NetCE, Elite prevented Dr. Jouria from performing his obligations pursuant to the Contracts.

87. Elite intentionally interfered with the NDA between Alpine and NetCE by obtaining and utilizing confidential information about articles and courses NetCE was preparing to publish, subject matter NetCE was preparing to explore for future publication, and NetCE's business strategy information and financials. Upon information and belief, Elite also intentionally interfered with the NDA between Alpine and NetCE by obtaining and reviewing other confidential and proprietary information NetCE shared with Alpine. Pursuant to the terms of the NDA between Alpine and NetCE, all of this information was confidential and shared with Alpine purely for the purposes of evaluating the propriety of purchasing NetCE. In exploiting this confidential and proprietary information, Elite prevented Alpine from fulfilling its obligations under the contract.

88. As a proximate result of Elite's conduct, NetCE has suffered damages in an amount to be proven at trial.

89. In addition, Elite's conduct has permanently and irreparably harmed NetCE. NetCE is therefore entitled to injunctive relief.

90. Elite's aforementioned conduct was willful, malicious, fraudulent and in conscious disregard of NetCE's rights and interests and, on information and belief, was undertaken with the intent to injure NetCE's property and legal rights. Accordingly, an award of punitive damages is justified.

91. Alpine was aware of the Contracts between Dr. Jouria and NetCE.

92. Alpine intentionally interfered with the contracts between Dr. Jouria and NetCE by sharing information about the articles and subject matter in development with Dr. Jouria with Elite, as well as proprietary information about NetCE's financials and business strategy. Pursuant to the terms of the Contracts, these articles were the property of NetCE. In tipping Elite off to the existence of NetCE-owned content authored by Dr. Jouria, Alpine prevented Dr. Jouria from performing his obligations pursuant to the Contracts.

Holland & Knight LLP
50 California Street, 28th Floor
San Francisco, CA 94111
Tel: (415) 743-6900
Fax: (415) 743-6910

93. As a proximate result of Alpine's conduct, NetCE has suffered damages in an amount to be proven at trial.

94. In addition, Alpine's conduct has permanently and irreparably harmed NetCE. NetCE is therefore entitled to injunctive relief.

95. Alpine's aforementioned conduct was willful, malicious, fraudulent and in conscious disregard of NetCE's rights and interests and, on information and belief, was undertaken with the intent to injure NetCE's property and legal rights. Accordingly, an award of punitive damages is justified.

**CLAIM FOUR : UNFAIR BUSINESS PRACTICES UNDER CALIFORNIA BUSINESS & PROFESSIONAL CODE, code § 17200 *et seq***

(Against Elite Continuing Education and Alpine)

96. NetCE hereby repeats and re-alleges each and every allegation contained in Paragraphs 1-95 as if fully set forth herein.

97. A business practice or act is "unfair" under California Business and Professions Code § 17200 *et seq.* if the reasons, justifications, and motives of the alleged wrongdoer are outweighed by the gravity of the harm.

98. Upon information and belief, Elite was aware of the Contracts between NetCE and Dr. Jouria and was aware that Dr. Jouria had submitted articles pursuant to the Contracts to NetCE and that NetCE had edited, refined, and finalized the articles Dr. Jouria eventually submitted to Elite. Upon information and belief, Elite did not require Dr. Jouria to make any representations or warranties that selling articles to Elite would not violate the intellectual property rights of any third party. Elite accepted the articles Dr. Jouria submitted and published them with minimal, if any, editing or revision.

99. Upon information and belief, Elite was also aware of NetCE's NDA with Alpine. Upon information and belief, Alpine shared, and Elite capitalized upon, confidential and proprietary information belonging to NetCE. Upon information and belief, Elite was fully and completely aware that the information regarding NetCE Elite obtained from Alpine was proprietary. Upon information

Holland & Knight LLP
50 California Street, 28th Floor
San Francisco, CA 94111
Tel: (415) 743-6900
Fax: (415) 743-6910

and belief, Elite opportunistically used NetCE's proprietary information in order to gain an advantage in the marketplace.

100. Alpine was aware that the NetCE information to which it had access was proprietary and confidential and that Alpine did not have permission to share this information with unauthorized third parties, such as Elite. Following the breakdown of discussion between NetCE and Alpine, Alpine secured a financial interest in Elite, and, upon information and belief, Alpine willfully and maliciously shared NetCE confidential information with Elite with the aim of securing a competitive advantage for Elite.

101. Defendants' actions discussed herein constitute unfair competition within the meaning of California Business and Professions Code § 17200 *et seq.*

102. NetCE at all times has acted with the utmost good faith.

103. As a proximate result of Defendants' actions, consumers were erroneously led to believe that material Elite and Dr. Jouria published together was a product the Defendants had crafted together and that Elite had vetted.

104. As a direct and proximate result of Defendants' actions, NetCE has suffered and will continue to suffer lost profits in an amount to be proven at trial.

105. NetCE is entitled to preliminary and permanent injunctive relief that orders Defendants to cease this unfair competition and disgorge any profits associated with unfair competition.

**CLAIM FIVE: MISAPPROPRIATION OF TRADE SECRETS UNDER CALIFORNIA'S UNIFORM TRADE SECRETS ACT (CIVIL CODE** § 3426 ***et seq.***).
(Against Elite Continuing Education and Alpine)

106. NetCE hereby repeats and re-alleges each and every allegation contained in Paragraphs 1-105 as if fully set forth herein.

107. NetCE has enjoyed, and continues to enjoy, an advantage over its existing and prospective competitors in the design, development, research, selection, publication, marketing, and

Holland & Knight LLP
50 California Street, 28th Floor
San Francisco, CA 94111
Tel: (415) 743-6900
Fax: (415) 743-6910

sale of products and services because of the above-described confidential and proprietary information.

108. NetCE has made reasonable efforts under the circumstances to preserve the confidentiality of its information, including without limitation, containing the dissemination of confidential and proprietary information to necessary NetCE personnel, instructing employees not to share such information beyond the company, and requiring Alpine to sign the NDA prior to revealing the proprietary and confidential information to Alpine.

109. NeCE's proprietary and confidential information derives independent economic value from not being generally known to the public or to other persons who can obtain economic value from their disclosure or use. This is exemplified in part by the fact that NetCE was the vanguard continuing education provider in the subject matter of the courses at issue (as well as in the subject matter of its other courses, which are not at issue in this lawsuit). As described above, the process by which NetCE selects and curates courses is time-consuming and costly. Any content provider, NetCE included, derives significant value from its product being first on the market, even if only for a short time. Accordingly, the above-described information constitutes "trade secrets."

110. Alpine, by virtue of its NDA with NetCE, and Elite, by virtue of its awareness of the NDA and the knowledge that insider information about NetCE was confidential and proprietary, had a duty not to exploit or publicize NetCE's confidential and proprietary information without NetCE's authorizations. Alpine and Elite knew or should have known that they had acquired such information under circumstances giving rise to a duty to maintain its secrecy or limit its use, and/or derived from or through a person who has such a duty and/or through improper means. Nevertheless, Alpine disclosed this information to, at least, Elite, and Elite, even knowing that the

Holland & Knight LLP
50 California Street, 28th Floor
San Francisco, CA 94111
Tel: (415) 743-6900
Fax: (415) 743-6910

information was confidential and proprietary and being shared impermissibly, exploited it, and even claimed some of the information as its own work product.

111. Until it obtained NetCE's confidential information, upon information and belief, Elite had no plans to develop or publish course material in the subject matter of the seven (7) offending articles.

112. Elite obtained the proprietary and confidential information described above (including without limitation NetCE's plans for future courses and NetCE's development work for courses to reach the market in a short time) from Alpine and not from generally available information or from Elite's own independent efforts.

113. Both Alpine's and Elite's actions constitute misappropriation of NetCE's trade secrets pursuant to Cal. Civ. Code. s. 3426.4, *et. seq.*

114. Alpine's and Elite's actions were done willfully and maliciously, entitling NetCE to exemplary damages.

115. As a direct and proximate result of Alpine's and Elite's misappropriation of NetCE's trade secrets, Elite (and Alpine) have been unjustly enriched, and NetCE has sustained damages to be proven at trial.

116. NetCE has also suffered irreparable harm as a result of Alpine's and Elite's actions, and will continue to suffer irreparable injury that cannot be adequately remedied at law unless Alpine and its officers, agents, and employees, and all other persons acting in concert with it, and Elite and *its* officers, agents, and employees, and all other persons acting in concert with *it*, are enjoined from engaging in further acts of misappropriation.

117. NetCE is entitled to attorneys' fees pursuant to Cal. Civ. Code s. 3426.4.

///

Holland & Knight LLP
50 California Street, 28th Floor
San Francisco, CA 94111
Tel: (415) 743-6900
Fax: (415) 743-6910

Holland & Knight LLP
50 California Street, 28th Floor
San Francisco, CA 94111
Tel: (415) 743-6900
Fax: (415) 743-6910

## PRAYER FOR RELIEF

WHEREFORE, NetCE prays for judgment against Defendants as follows:

1. For entry of judgment against Defendants on all Claims for Relief;

2. Pursuant to this Court's equity powers and 28 U.S.C. § 2202, for an injunction permanently requiring Elite to (a) refrain from publishing, reproducing, distributing, or placing in the market the copyrighted works of NetCE or any derivative work thereof and to (b) destroy any existing unauthorized reproductions or disseminations of the copyrighted works of NetCE and requiring Alpine to refrani from sharing, disseminating, or in any way using the confidential and proprietary information it obtained from NetCE pursuant to the NDA;

3. Pursuant to this Court's equity powers and 28 U.S.C. § 2202, for an injunction requiring Elite to return any copies of NetCE copyrighted material or any derivative work thereof unlawful obtained, reproduced, or copied and to fully disclose, under penalty of perjury, the names and whereabouts of all persons to whom, and entities to which, such information has been further distributed by them;

4. Pursuant to this Court's equity powers and 28 U.S.C. § 2202 for an order providing for the impoundment, destruction, or other reasonable disposition of all complete or partial copies of the copyrightable protected material in the possession or control of Elite, or Alpine and a complete disclosure of the location of any such copies;

5. For compensatory and actual damages in an amount according to proof;

6. For an award of exemplary damages;

7. For an award of punitive damages;

8. For an award reflecting the amount by which Defendants have been unjustly enriched;

9. For reasonable royalties;

10. For costs of suit and reasonable attorneys' fees incurred in the course of this litigation;

11. For an award of statutory damages;

12. For post-judgment interest, pursuant to 28 U.S.C. § 1961, continuing until such judgment is paid, at the maximum rate allowed by law;

13. For pre-judgment interest, at the maximum rate allowed by U.S. Copyright Law; and

14. For such other relief as the Court deems just and proper.

DATED: December 16, 2015

/s/ John Kern
HOLLAND & KNIGHT LLP
John Kern
Jessica Lanier
Attorneys for Plaintiff CE RESOURCE, INC. d/b/a CME RESOURCE and NetCE

Holland & Knight LLP
50 California Street, 28th Floor
San Francisco, CA 94111
Tel: (415) 743-6900
Fax: (415) 743-6910

# EXHIBIT A

# Certificate of Registration

This Certificate issued under the seal of the Copyright Office in accordance with title 17, *United States Code*, attests that registration has been made for the work identified below. The information on this certificate has been made a part of the Copyright Office records.

United States Register of Copyrights and Director

**Registration Number**
**TX 8-119-516**
**Effective Date of Registration:**
May 15, 2015

## Title

**Title of Work:** 852 Gastroesophageal Reflux Disease

## Completion/Publication

**Year of Completion:** 2013
**Date of 1st Publication:** May 15, 2013
**Nation of 1st Publication:** United States

## Author

- **Author:** CE Resource, Inc., dba NetCE
  **Author Created:** text
  **Work made for hire:** Yes
  **Domiciled in:** United States
  **Year Born:** N/A
  **Year Died:** N/A

## Copyright Claimant

**Copyright Claimant:** CE Resource, Inc., dba CME Resource
1482 Stone Point Drive, Suite 120, Roseville, CA, 95661, United States

## Certification

**Name:** Erin Meinyer, Executive Director
**Date:** May 07, 2015

# Certificate of Registration

This Certificate issued under the seal of the Copyright Office in accordance with title 17, *United States Code*, attests that registration has been made for the work identified below. The information on this certificate has been made a part of the Copyright Office records.

United States Register of Copyrights and Director

**Registration Number**
**TX 8-119-463**
**Effective Date of Registration:**
May 15, 2015

## Title

**Title of Work:** 9538 Nonantibiotic Antimicrobial Pharmacology: A Review

## Completion/Publication

**Year of Completion:** 2013
**Date of 1st Publication:** January 17, 2013
**Nation of 1st Publication:** United States

## Author

- **Author:** CE Resource, Inc., dba NetCE
  **Author Created:** text
  **Work made for hire:** Yes
  **Domiciled in:** United States
  **Year Born:** N/A
  **Year Died:** N/A

## Copyright Claimant

**Copyright Claimant:** CE Resource, Inc., dba CME Resource
1482 Stone Point Drive, Suite 120, Roseville, CA, 95661, United States

## Certification

**Name:** Erin Meinyer, Executive Director
**Date:** May 07, 2015

# Certificate of Registration

This Certificate issued under the seal of the Copyright Office in accordance with title 17, *United States Code*, attests that registration has been made for the work identified below. The information on this certificate has been made a part of the Copyright Office records.

Maria A. Pallante

United States Register of Copyrights and Director

**Registration Number**
**TX 8-119-503**
**Effective Date of Registration:**
May 15, 2015

## Title

**Title of Work:** 875 The Lymphatic and Immune Systems: A Review

## Completion/Publication

**Year of Completion:** 2012
**Date of 1st Publication:** September 06, 2012
**Nation of 1st Publication:** United States

## Author

- **Author:** CE Resource, Inc., dba NetCE
  **Author Created:** text
  **Work made for hire:** Yes
  **Domiciled in:** United States
  **Year Born:** N/A
  **Year Died:** N/A

## Copyright Claimant

**Copyright Claimant:** CE Resource, Inc., dba CME Resource, dba CME Resource
1482 Stone Point Drive, Suite 120, Roseville, CA, 95661, United States

## Certification

**Name:** Erin Meinyer, Executive Director
**Date:** May 07, 2015

# Certificate of Registration

This Certificate issued under the seal of the Copyright Office in accordance with title 17, *United States Code*, attests that registration has been made for the work identified below. The information on this certificate has been made a part of the Copyright Office records.

United States Register of Copyrights and Director

**Registration Number**
**TX 8-119-523**
**Effective Date of Registration:**
May 15, 2015

## Title

**Title of Work:** 511 Clinical Cardiovascular Pharmacology

## Completion/Publication

**Year of Completion:** 2012
**Date of 1st Publication:** December 06, 2012
**Nation of 1st Publication:** United States

## Author

- **Author:** CE Resource, Inc., dba NetCE
  **Author Created:** text
  **Work made for hire:** Yes
  **Domiciled in:** United States
  **Year Born:** N/A
  **Year Died:** N/A

## Copyright Claimant

**Copyright Claimant:** CE Resource, Inc., dba CME Resource
1482 Stone Point Drive, Suite 120, Roseville, CA, 95661, United States

## Certification

**Name:** Erin Meinyer, Executive Director
**Date:** May 07, 2015

# Certificate of Registration

This Certificate issued under the seal of the Copyright Office in accordance with title 17, *United States Code*, attests that registration has been made for the work identified below. The information on this certificate has been made a part of the Copyright Office records.

United States Register of Copyrights and Director

**Registration Number**
**TX 8-119-506**
**Effective Date of Registration:**
May 15, 2015

## Title

**Title of Work:** 025 Traumatic Brain Injury

## Completion/Publication

**Year of Completion:** 2012
**Date of 1st Publication:** December 20, 2012
**Nation of 1st Publication:** United States

## Author

- **Author:** CE Resource, Inc., dba NetCE
  **Author Created:** text
  **Work made for hire:** Yes
  **Domiciled in:** United States
  **Year Born:** N/A
  **Year Died:** N/A

- **Author:** CE Resource, Inc., dba CME Resource

## Copyright Claimant

**Copyright Claimant:** CE Resource, Inc., dba CME Resource
1482 Stone Point Drive, Suite 120, Roseville, CA, 95661, United States

## Certification

**Name:** Erin Meinyer, Executive Director
**Date:** May 07, 2015

# Certificate of Registration

This Certificate issued under the seal of the Copyright Office in accordance with title 17, *United States Code*, attests that registration has been made for the work identified below. The information on this certificate has been made a part of the Copyright Office records.

Maria A. Pallante

United States Register of Copyrights and Director

**Registration Number**

**TX 8-119-471**

**Effective Date of Registration:**
May 15, 2015

## Title

**Title of Work:** 3528 Cancer and Chemotherapy

## Completion/Publication

**Year of Completion:** 2013
**Date of 1st Publication:** March 21, 2013
**Nation of 1st Publication:** United States

## Author

- **Author:** CE Resource, Inc., dba NetCE
**Author Created:** text
**Work made for hire:** Yes
**Domiciled in:** United States
**Year Born:** N/A
**Year Died:** N/A

## Copyright Claimant

**Copyright Claimant:** CE Resource, Inc., dba CME Resource
1482 Stone Point Drive, Suite 120, Roseville, CA, 95661, United States

## Certification

**Name:** Erin Meinyer, Executive Director
**Date:** May 07, 2015

# EXHIBIT B

CME RESOURCE
Continuing Medical Education

This Freelance Writer Agreement (the "***Agreement***") is entered into by **Jassin Jouria, Jr, MD** ("***Writer***"), and CME Resource ("***CME***").

In consideration of the mutual covenants made herein, the parties agree as follows:

1. **Parties:** Writer is engaged in the business of writing articles and other materials on a freelance basis. CME is engaged in the business of the publication of continuing education materials for medical, nursing, dental and other practitioners.

2. **Relationship:** The parties expressly agree and acknowledge that the relationship created by this Agreement is one of independent contractor. CME is not the employer of Writer, and Writer is not, and will not be treated as, an employee of CME for federal tax purposes, or any other purpose.

3. **Contract Period:** This Agreement will begin on the date set forth below and shall continue until terminated as provided herein. If either party violates a term of this Agreement, then the other party (the "***Nonbreaching Party***") may terminate this Agreement, effective immediately upon delivery of written notice of termination by the Nonbreaching Party. Notwithstanding the foregoing, CME may terminate this Agreement at any time, with or without cause, effective upon thirty (30) days written notice.

4. **Services to be Provided by Writer:** Writer agrees to submit, on his or her sole initiative or at the request of CME, written articles to CME on the subjects and in such format and at such times as set forth in Attachment 1 (the "Articles"). Attachment 1 may be revised from time to time by mutual written agreement between parties.

5. **Representations and Warranties of Writer:** By submitting an Article to CME, Writer represents and warrants the following: (a) the Article is accurate and is Writer's original work, (b) the Article has not been obtained by unlawful means and is not owned by any third party, (c) Writer has not submitted the Article to any other party for publication nor has the Article been previously published in any manner or medium, specifically including but not limited to, print or electronic medium, (d) Writer will not submit the Article to any other party for publication unless and until CME expressly rejects the Article, and (e) the Article by CME will not infringe or violate any copyright or other intellectual property right, privacy rights, publicity rights or any other rights of any third party.

POST OFFICE BOX 997571 • SACRAMENTO, CALIFORNIA 95899-7571
1482 STONE POINT DRIVE • SUITE 120 • ROSEVILLE, CALIFORNIA 95661
PHONE: 800/232-4238 • FAX: 916/783-6067 • WWW.NETCE.COM

6. **Indemnification:** Writer shall indemnify and hold harmless CME and its agents, directors, employees, licensees and affiliates from and against any claim, loss, damage, liability and expenses (including reasonable attorneys' fees and costs associated therewith) arising from any breach of any of Writer's representations or warranties contained in this Agreement. Writer shall cooperate with CME if any complaints, claims or litigation should arise regarding the Articles.

7. **Compensation:** CME agrees to pay Writer **$400** per credit per Article to be published by CME with payments not to exceed an aggregate amount of **$12000** per Article. For purposes of this Agreement, one "credit" is equal to approximately 2,000 words. Under no circumstances will Writer be paid on an hourly, daily or other basis that is a function of time. Writer acknowledges and agrees that CME will only pay writer for Articles that are approved for publication by CME, and that CME has the sole and exclusive authority and discretion to determine whether or not to approve and/or publish any and all Articles submitted by Writer.

8. **Taxes:** As an independent contractor, Writer shall be responsible for the reporting, deposit and payment of any and all federal, state, and local taxes, including but not limited to income taxes, FICA taxes, and unemployment taxes incidental to the performance of, or payment under, this Agreement.

9. **Ownership and Assignment of Intellectual Property:** Writer hereby understands and agrees that all Articles approved for publication by CME under this Agreement shall belong exclusively to CME. Without limiting the foregoing, Writer agrees that, to the maximum extent allowed by law, all such Articles shall be deemed to be "works made for hire" under all relevant copyright laws, and CME shall be deemed to be the author thereof. If and to the extent any Article is determined not to constitute "works made for hire," Writer hereby irrevocably assigns and transfers to CME and its successors and assigns all right, title, and interest in and to the Article, including all copyright rights (including but not limited to rights in audiovisual works and moral rights), patent rights, trade secret rights, trademark rights, rights of privacy and publicity, and any other intellectual property rights, and all economic rights, including, without limitation, the rights to reproduce, manufacture, use, adapt, modify, publish, distribute, sublicense, publicly perform and communicate, translate, lease, import, in each case, in any medium, and otherwise exploit the Article. Writer agrees to cooperate with and assist CME in applying for, and executing any applications and/or assignments reasonably necessary to record and evidence CME's rights in the Articles. Writer hereby appoints CME as his or her attorney-in-fact in the event that Writer does not or cannot perform his or her obligations regarding the ownership and assignment of the Articles, and only for such limited purposes. Without limiting the foregoing, CME has the right to edit the Articles as it deems appropriate for publication or use in accordance with the rights granted by Writer herein, and that Writer will cooperate with CME in editing, fact

checking and otherwise reviewing the Articles prior to publication. Writer will be credited as the original author of the Article in any and every republication. Writer acknowledges and understands that at no time shall Writer have any right to block publication of an Article provided that CME removes Writer's name from said Article.

10. **Miscellaneous:** This Agreement will be governed by and under the laws of the State of California without regard to its conflicts of laws provisions. This Agreement may be modified only by a written amendment executed by Writer and a duly authorized officer of CME. Any failure by either party to enforce any of the provisions of this Agreement will not be construed as a waiver of such provisions or the right of a party thereafter to enforce each and every such provision. This Agreement constitutes the complete and exclusive statement of the agreement between the parties and supersedes all proposals, oral or written, and all other communications between the parties relating to the subject matter of this Agreement.

**CME Resource has not received commercial support for the development of this article. CME Resource is obligated to ensure that potential and/or real conflicts of interest of faculty and their immediate family are identified and resolved to preserve the integrity of the content presented.**

11. **Disclosure:** Writer agrees to list below all affiliations with or financial involvement within the last twelve (12) months in any organization or entity with a direct financial interest in the subject matter or materials of the research discussed. Writer also agrees to list below all unlabeled or investigational use of commercial products to be discussed in the article. Refusal to disclose will result in disqualification.

A. Will your article include discussion of any commercial products or services?
Yes ______ No __√__ (If No, skip to question B.)

If Yes, in the last twelve (12) months have you or members of your immediate family (spouse or partner) had any relevant financial interest or other relationship with the manufacturer(s) of any of the products or provider(s) of any of the services you intend to cover? ***A relevant financial interest or relationship*** *is defined as benefiting by receiving a salary, royalty, intellectual property rights, consulting fee, honoraria, ownership interest (e.g., stocks, stock options or other ownership interest* ***in any amount****, excluding diversified mutual funds) or other financial benefit (e.g., employment, management position, independent contractor including contracted research, consulting, speaking and teaching, membership on advisory committees or review panels, board membership, and other activities from which remuneration is received, or expected).*
Yes ______ No __√__

rd

If Yes, please list the manufacturer(s) or provider(s) and describe the nature of the relationship(s).

______________________________________________
______________________________________________

B. Do you anticipate your article will include discussion of unlabeled use of commercial products? *(Commercial product does not have an FDA-approval indication for the use you will be discussing.)*
Yes______ No___✓___

Name of commercial product: ______________________
Unlabeled use to be discussed: ______________________
______________________________________________

Name of commercial product: ______________________
Unlabeled use to be discussed: ______________________
______________________________________________

C. Do you anticipate your article will include discussion of investigational use of commercial products? *(Commercial product is not approved by the FDA for any purpose.)*
Yes______ No___✓___

Name of commercial product: ______________________
Investigational use to be discussed: ______________________
______________________________________________

Name of commercial product: ______________________
Investigational use to be discussed: ______________________
______________________________________________

12. If any images are included in an Article, Writer agrees not to edit, modify, or falsify such images.

13. The course completion date of this project is: **<u>March 31, 2013</u>**. On this date, **CME Resource** must physically have all units of **<u>The Lymphatic and Immune Systems: A Comprehensive Review</u>**.

This contract becomes null and void if not received by **CME Resource** by **<u>June 7, 2012</u>**. If there are any addendums or special requirements **<u>Jassin Jouria, Jr, MD</u>** desires of this contract, they must be submitted in writing to **CME Resource** prior to this date and a revised contract issued.

This Agreement is entered into on this 10th day of May 2012.

| **Writer** | **CME Resource** |
| --- | --- |
| Jassin Jouria, Jr, MD | By: scampbell |
| | Name: **SARAH CAMPBELL** |
| 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 | Title: **DIRECTOR OF DEVELOPMENT** |
| [WRITER'S SOCIAL SECURITY #] | |

## Attachment 1

Subjects on which CME may accept Articles from Writer:

<u>The Lymphatic and Immune Systems: A Comprehensive Review</u>

CME RESOURCE
Continuing Medical Education

This Freelance Writer Agreement (the "*Agreement*") is entered into by **Jassin M. Jouria, Jr., MD** ("*Writer*"), and CME Resource ("*CME*").

In consideration of the mutual covenants made herein, the parties agree as follows:

1. **Parties:** Writer is engaged in the business of writing articles and other materials on a freelance basis. CME is engaged in the business of the publication of continuing education materials for medical, nursing, dental and other practitioners.

2. **Relationship:** The parties expressly agree and acknowledge that the relationship created by this Agreement is one of independent contractor. CME is not the employer of Writer, and Writer is not, and will not be treated as, an employee of CME for federal tax purposes, or any other purpose.

3. **Contract Period:** This Agreement will begin on the date set forth below and shall continue until terminated as provided herein. If either party violates a term of this Agreement, then the other party (the "***Nonbreaching Party***") may terminate this Agreement, effective immediately upon delivery of written notice of termination by the Nonbreaching Party. Notwithstanding the foregoing, CME may terminate this Agreement at any time, with or without cause, effective upon thirty (30) days written notice.

4. **Services to be Provided by Writer:** Writer agrees to submit, on his or her sole initiative or at the request of CME, written articles to CME on the subjects and in such format and at such times as set forth in Attachment 1 (the "Articles"). Attachment 1 may be revised from time to time by mutual written agreement between parties.

5. **Representations and Warranties of Writer:** By submitting an Article to CME, Writer represents and warrants the following: (a) the Article is accurate and is Writer's original work, (b) the Article has not been obtained by unlawful means and is not owned by any third party, (c) Writer has not submitted the Article to any other party for publication nor has the Article been previously published in any manner or medium, specifically including but not limited to, print or electronic medium, (d) Writer will not submit the Article to any other party for publication unless and until CME expressly rejects the Article, and (e) the Article by CME will not infringe or violate any copyright or other intellectual property right, privacy rights, publicity rights or any other rights of any third party.

6. **Indemnification:** Writer shall indemnify and hold harmless CME and its agents, directors, employees, licensees and affiliates from and against any claim, loss, damage, liability and expenses (including reasonable attorneys' fees and costs associated therewith) arising from any breach of any of Writer's representations or warranties contained in this Agreement. Writer shall cooperate with CME if any complaints, claims or litigation should arise regarding the Articles.

7. **Compensation:** CME agrees to pay Writer **$400** per credit per Article to be published by CME with payments not to exceed an aggregate amount of **$12000** per Article. For purposes of this Agreement, one "credit" is equal to approximately 2,000 words. Under no circumstances will Writer be paid on an hourly, daily or other basis that is a function of time. Writer acknowledges and agrees that CME will only pay writer for Articles that are approved for publication by CME, and that CME has the sole and exclusive authority and discretion to determine whether or not to approve and/or publish any and all Articles submitted by Writer.

8. **Taxes:** As an independent contractor, Writer shall be responsible for the reporting, deposit and payment of any and all federal, state, and local taxes, including but not limited to income taxes, FICA taxes, and unemployment taxes incidental to the performance of, or payment under, this Agreement.

9. **Ownership and Assignment of Intellectual Property:** Writer hereby understands and agrees that all Articles approved for publication by CME under this Agreement shall belong exclusively to CME. Without limiting the foregoing, Writer agrees that, to the maximum extent allowed by law, all such Articles shall be deemed to be "works made for hire" under all relevant copyright laws, and CME shall be deemed to be the author thereof. If and to the extent any Article is determined not to constitute "works made for hire," Writer hereby irrevocably assigns and transfers to CME and its successors and assigns all right, title, and interest in and to the Article, including all copyright rights (including but not limited to rights in audiovisual works and moral rights), patent rights, trade secret rights, trademark rights, rights of privacy and publicity, and any other intellectual property rights, and all economic rights, including, without limitation, the rights to reproduce, manufacture, use, adapt, modify, publish, distribute, sublicense, publicly perform and communicate, translate, lease, import, in each case, in any medium, and otherwise exploit the Article. Writer agrees to cooperate with and assist CME in applying for, and executing any applications and/or assignments reasonably necessary to record and evidence CME's rights in the Articles. Writer hereby appoints CME as his or her attorney-in-fact in the event that Writer does not or cannot perform his or her obligations regarding the ownership and assignment of the Articles, and only for such limited purposes. Without limiting the foregoing, CME has the right to edit the Articles as it deems appropriate for publication or use in accordance with the rights granted by Writer herein, and that Writer will cooperate with CME in editing, fact

checking and otherwise reviewing the Articles prior to publication. Writer will be credited as the original author of the Article in any and every republication. Writer acknowledges and understands that at no time shall Writer have any right to block publication of an Article provided that CME removes Writer's name from said Article.

10. **Miscellaneous:** This Agreement will be governed by and under the laws of the State of California without regard to its conflicts of laws provisions. This Agreement may be modified only by a written amendment executed by Writer and a duly authorized officer of CME. Any failure by either party to enforce any of the provisions of this Agreement will not be construed as a waiver of such provisions or the right of a party thereafter to enforce each and every such provision. This Agreement constitutes the complete and exclusive statement of the agreement between the parties and supersedes all proposals, oral or written, and all other communications between the parties relating to the subject matter of this Agreement.

**CME Resource has not received commercial support for the development of this article. CME Resource is obligated to ensure that potential and/or real conflicts of interest of faculty and their immediate family are identified and resolved to preserve the integrity of the content presented.**

11. **Disclosure:** Writer agrees to list below all affiliations with or financial involvement within the last twelve (12) months in any organization or entity with a direct financial interest in the subject matter or materials of the research discussed. Writer also agrees to list below all unlabeled or investigational use of commercial products to be discussed in the article. Refusal to disclose will result in disqualification.

A. Will your article include discussion of any commercial products or services?
Yes ______ No __✓__ (If No, skip to question B.)

If Yes, in the last twelve (12) months have you or members of your immediate family (spouse or partner) had any relevant financial interest or other relationship with the manufacturer(s) of any of the products or provider(s) of any of the services you intend to cover? ***A relevant financial interest or relationship*** *is defined as benefiting by receiving a salary, royalty, intellectual property rights, consulting fee, honoraria, ownership interest (e.g., stocks, stock options or other ownership interest* ***in any amount****, excluding diversified mutual funds) or other financial benefit (e.g., employment, management position, independent contractor including contracted research, consulting, speaking and teaching, membership on advisory committees or review panels, board membership, and other activities from which remuneration is received, or expected).*
Yes ______ No ______

If Yes, please list the manufacturer(s) or provider(s) and describe the nature of the relationship(s).

______________________________________________

______________________________________________

B. Do you anticipate your article will include discussion of unlabeled use of commercial products? *(Commercial product does not have an FDA-approval indication for the use you will be discussing.)*
Yes______ No__✓___

Name of commercial product: ______________________________
Unlabeled use to be discussed: ______________________________
______________________________________________

Name of commercial product: ______________________________
Unlabeled use to be discussed: ______________________________
______________________________________________

C. Do you anticipate your article will include discussion of investigational use of commercial products? *(Commercial product is not approved by the FDA for any purpose.)*
Yes______ No__✓___

Name of commercial product: ______________________________
Investigational use to be discussed: __________________________
______________________________________________

Name of commercial product: ______________________________
Investigational use to be discussed: __________________________
______________________________________________

12. If any images are included in an Article, Writer agrees not to edit, modify, or falsify such images.

13. The course completion date of this project is: **July 31, 2013**. On this date, **CME Resource** must physically have all units of **Depression and Dementia in the Elderly**.

This contract becomes null and void if not received by **CME Resource** by **April 15, 2013**. If there are any addendums or special requirements **Jassin M. Jouria, Jr., MD** desires of this contract, they must be submitted in writing to **CME Resource** prior to this date and a revised contract issued.

This Agreement is entered into on this 5TH day of April 2013.

**Writer**

Jassin M. Jouria, Jr., MD

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
[WRITER'S SOCIAL SECURITY #]

**CME Resource**

By: scampbell

Name: **SARAH CAMPBELL**

Title: **DIRECTOR OF DEVELOPMENT**

## Attachment 1

Subjects on which CME may accept Articles from Writer:

Depression and Dementia in the Elderly

This Freelance Writer Agreement (the "***Agreement***") is entered into by **Jassin Jouria, Jr. MD** ("***Writer***"), and CME Resource ("***CME***").

In consideration of the mutual covenants made herein, the parties agree as follows:

1. **Parties:** Writer is engaged in the business of writing articles and other materials on a freelance basis. CME is engaged in the business of the publication of continuing education materials for medical, nursing, dental and other practitioners.

2. **Relationship:** The parties expressly agree and acknowledge that the relationship created by this Agreement is one of independent contractor. CME is not the employer of Writer, and Writer is not, and will not be treated as, an employee of CME for federal tax purposes, or any other purpose.

3. **Contract Period:** This Agreement will begin on the date set forth below and shall continue until terminated as provided herein. If either party violates a term of this Agreement, then the other party (the "***Nonbreaching Party***") may terminate this Agreement, effective immediately upon delivery of written notice of termination by the Nonbreaching Party. Notwithstanding the foregoing, CME may terminate this Agreement at any time, with or without cause, effective upon thirty (30) days written notice.

4. **Services to be Provided by Writer:** Writer agrees to submit, on his or her sole initiative or at the request of CME, written articles to CME on the subjects and in such format and at such times as set forth in Attachment 1 (the "Articles"). Attachment 1 may be revised from time to time by mutual written agreement between parties.

5. **Representations and Warranties of Writer:** By submitting an Article to CME, Writer represents and warrants the following: (a) the Article is accurate and is Writer's original work, (b) the Article has not been obtained by unlawful means and is not owned by any third party, (c) Writer has not submitted the Article to any other party for publication nor has the Article been previously published in any manner or medium, specifically including but not limited to, print or electronic medium, (d) Writer will not submit the Article to any other party for publication unless and until CME expressly rejects the Article, and (e) the Article by CME will not infringe or violate any copyright or other intellectual property right, privacy rights, publicity rights or any other rights of any third party.

6. **Indemnification:** Writer shall indemnify and hold harmless CME and its agents, directors, employees, licensees and affiliates from and against any claim, loss, damage, liability and expenses (including reasonable attorneys' fees and costs associated therewith) arising from any breach of any of Writer's representations or warranties contained in this Agreement. Writer shall cooperate with CME if any complaints, claims or litigation should arise regarding the Articles.

7. **Compensation:** CME agrees to pay Writer **$400** per credit per Article to be published by CME with payments not to exceed an aggregate amount of **$12000** per Article. For purposes of this Agreement, one "credit" is equal to approximately 2,000 words. Under no circumstances will Writer be paid on an hourly, daily or other basis that is a function of time. Writer acknowledges and agrees that CME will only pay writer for Articles that are approved for publication by CME, and that CME has the sole and exclusive authority and discretion to determine whether or not to approve and/or publish any and all Articles submitted by Writer.

8. **Taxes:** As an independent contractor, Writer shall be responsible for the reporting, deposit and payment of any and all federal, state, and local taxes, including but not limited to income taxes, FICA taxes, and unemployment taxes incidental to the performance of, or payment under, this Agreement.

9. **Ownership and Assignment of Intellectual Property:** Writer hereby understands and agrees that all Articles approved for publication by CME under this Agreement shall belong exclusively to CME. Without limiting the foregoing, Writer agrees that, to the maximum extent allowed by law, all such Articles shall be deemed to be "works made for hire" under all relevant copyright laws, and CME shall be deemed to be the author thereof. If and to the extent any Article is determined not to constitute "works made for hire," Writer hereby irrevocably assigns and transfers to CME and its successors and assigns all right, title, and interest in and to the Article, including all copyright rights (including but not limited to rights in audiovisual works and moral rights), patent rights, trade secret rights, trademark rights, rights of privacy and publicity, and any other intellectual property rights, and all economic rights, including, without limitation, the rights to reproduce, manufacture, use, adapt, modify, publish, distribute, sublicense, publicly perform and communicate, translate, lease, import, in each case, in any medium, and otherwise exploit the Article. Writer agrees to cooperate with and assist CME in applying for, and executing any applications and/or assignments reasonably necessary to record and evidence CME's rights in the Articles. Writer hereby appoints CME as his or her attorney-in-fact in the event that Writer does not or cannot perform his or her obligations regarding the ownership and assignment of the Articles, and only for such limited purposes. Without limiting the foregoing, CME has the right to edit the Articles as it deems appropriate for publication or use in accordance with the rights granted by Writer herein, and that Writer will cooperate with CME in editing, fact

checking and otherwise reviewing the Articles prior to publication. Writer will be credited as the original author of the Article in any and every republication. Writer acknowledges and understands that at no time shall Writer have any right to block publication of an Article provided that CME removes Writer's name from said Article.

10. **Miscellaneous:** This Agreement will be governed by and under the laws of the State of California without regard to its conflicts of laws provisions. This Agreement may be modified only by a written amendment executed by Writer and a duly authorized officer of CME. Any failure by either party to enforce any of the provisions of this Agreement will not be construed as a waiver of such provisions or the right of a party thereafter to enforce each and every such provision. This Agreement constitutes the complete and exclusive statement of the agreement between the parties and supersedes all proposals, oral or written, and all other communications between the parties relating to the subject matter of this Agreement.

**CME Resource has not received commercial support for the development of this article. CME Resource is obligated to ensure that potential and/or real conflicts of interest of faculty and their immediate family are identified and resolved to preserve the integrity of the content presented.**

11. **Disclosure:** Writer agrees to list below all affiliations with or financial involvement within the last twelve (12) months in any organization or entity with a direct financial interest in the subject matter or materials of the research discussed. Writer also agrees to list below all unlabeled or investigational use of commercial products to be discussed in the article. Refusal to disclose will result in disqualification.

A. Will your article include discussion of any commercial products or services?
Yes ______ No __✓__ (If No, skip to question B.)

If Yes, in the last twelve (12) months have you or members of your immediate family (spouse or partner) had any relevant financial interest or other relationship with the manufacturer(s) of any of the products or provider(s) of any of the services you intend to cover? ***A relevant financial interest or relationship*** *is defined as benefiting by receiving a salary, royalty, intellectual property rights, consulting fee, honoraria, ownership interest (e.g., stocks, stock options or other ownership interest* ***in any amount****, excluding diversified mutual funds) or other financial benefit (e.g., employment, management position, independent contractor including contracted research, consulting, speaking and teaching, membership on advisory committees or review panels, board membership, and other activities from which remuneration is received, or expected).*
Yes ______ No __✓__

If Yes, please list the manufacturer(s) or provider(s) and describe the nature of the relationship(s).

________________________________________________

________________________________________________

B. Do you anticipate your article will include discussion of unlabeled use of commercial products? *(Commercial product does not have an FDA-approval indication for the use you will be discussing.)*

Yes______ No__✓__

Name of commercial product: ____________________________
Unlabeled use to be discussed: ____________________________

________________________________________________

Name of commercial product: ____________________________
Unlabeled use to be discussed: ____________________________

________________________________________________

C. Do you anticipate your article will include discussion of investigational use of commercial products? *(Commercial product is not approved by the FDA for any purpose.)*

Yes______ No__✓__

Name of commercial product: ____________________________
Investigational use to be discussed: ____________________________

________________________________________________

Name of commercial product: ____________________________
Investigational use to be discussed: ____________________________

________________________________________________

12. If any images are included in an Article, Writer agrees not to edit, modify, or falsify such images.

13. The course completion date of this project is: **June 30, 2013**. On this date, **CME Resource** must physically have all units of **Non-Antibiotic Antimicrobial Pharmacology: A Review**.

This contract becomes null and void if not received by **CME Resource** by **October 31, 2012**. If there are any addendums or special requirements **Jassin Jouria, Jr. MD** desires of this contract, they must be submitted in writing to **CME Resource** prior to this date and a revised contract issued.

This Agreement is entered into on this 12th day of October 2012.

**Writer**

Jassin Jouria, Jr. MD

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
[WRITER'S SOCIAL SECURITY #]

**CME Resource**

By: S Campbell

Name: **SARAH CAMPBELL**

Title: **DIRECTOR OF DEVELOPMENT**

CME RESOURCE
Continuing Medical Education

This Freelance Writer Agreement (the "***Agreement***") is entered into by **Jassin Jouria, Jr., MD** ("***Writer***"), and CME Resource ("***CME***").

In consideration of the mutual covenants made herein, the parties agree as follows:

1. **Parties:** Writer is engaged in the business of writing articles and other materials on a freelance basis. CME is engaged in the business of the publication of continuing education materials for medical, nursing, dental and other practitioners.

2. **Relationship:** The parties expressly agree and acknowledge that the relationship created by this Agreement is one of independent contractor. CME is not the employer of Writer, and Writer is not, and will not be treated as, an employee of CME for federal tax purposes, or any other purpose.

3. **Contract Period:** This Agreement will begin on the date set forth below and shall continue until terminated as provided herein. If either party violates a term of this Agreement, then the other party (the "***Nonbreaching Party***") may terminate this Agreement, effective immediately upon delivery of written notice of termination by the Nonbreaching Party. Notwithstanding the foregoing, CME may terminate this Agreement at any time, with or without cause, effective upon thirty (30) days written notice.

4. **Services to be Provided by Writer:** Writer agrees to submit, on his or her sole initiative or at the request of CME, written articles to CME on the subjects and in such format and at such times as set forth in Attachment 1 (the "Articles"). Attachment 1 may be revised from time to time by mutual written agreement between parties.

5. **Representations and Warranties of Writer:** By submitting an Article to CME, Writer represents and warrants the following: (a) the Article is accurate and is Writer's original work, (b) the Article has not been obtained by unlawful means and is not owned by any third party, (c) Writer has not submitted the Article to any other party for publication nor has the Article been previously published in any manner or medium, specifically including but not limited to, print or electronic medium, (d) Writer will not submit the Article to any other party for publication unless and until CME expressly rejects the Article, and (e) the Article by CME will not infringe or violate any copyright or other intellectual property right, privacy rights, publicity rights or any other rights of any third party.

POST OFFICE BOX 997571 • SACRAMENTO, CALIFORNIA 95899-7571
1482 STONE POINT DRIVE • SUITE 120 • ROSEVILLE, CALIFORNIA 95661
PHONE: 800/232-4238 • FAX: 916/783-6067 • WWW.NETCE.COM

6. **Indemnification:** Writer shall indemnify and hold harmless CME and its agents, directors, employees, licensees and affiliates from and against any claim, loss, damage, liability and expenses (including reasonable attorneys' fees and costs associated therewith) arising from any breach of any of Writer's representations or warranties contained in this Agreement. Writer shall cooperate with CME if any complaints, claims or litigation should arise regarding the Articles.

7. **Compensation:** CME agrees to pay Writer **$400** per credit per Article to be published by CME with payments not to exceed an aggregate amount of **$4000** per Article. For purposes of this Agreement, one "credit" is equal to approximately 2,000 words. Under no circumstances will Writer be paid on an hourly, daily or other basis that is a function of time. Writer acknowledges and agrees that CME will only pay writer for Articles that are approved for publication by CME, and that CME has the sole and exclusive authority and discretion to determine whether or not to approve and/or publish any and all Articles submitted by Writer.

8. **Taxes:** As an independent contractor, Writer shall be responsible for the reporting, deposit and payment of any and all federal, state, and local taxes, including but not limited to income taxes, FICA taxes, and unemployment taxes incidental to the performance of, or payment under, this Agreement.

9. **Ownership and Assignment of Intellectual Property:** Writer hereby understands and agrees that all Articles approved for publication by CME under this Agreement shall belong exclusively to CME. Without limiting the foregoing, Writer agrees that, to the maximum extent allowed by law, all such Articles shall be deemed to be "works made for hire" under all relevant copyright laws, and CME shall be deemed to be the author thereof. If and to the extent any Article is determined not to constitute "works made for hire," Writer hereby irrevocably assigns and transfers to CME and its successors and assigns all right, title, and interest in and to the Article, including all copyright rights (including but not limited to rights in audiovisual works and moral rights), patent rights, trade secret rights, trademark rights, rights of privacy and publicity, and any other intellectual property rights, and all economic rights, including, without limitation, the rights to reproduce, manufacture, use, adapt, modify, publish, distribute, sublicense, publicly perform and communicate, translate, lease, import, in each case, in any medium, and otherwise exploit the Article. Writer agrees to cooperate with and assist CME in applying for, and executing any applications and/or assignments reasonably necessary to record and evidence CME's rights in the Articles. Writer hereby appoints CME as his or her attorney-in-fact in the event that Writer does not or cannot perform his or her obligations regarding the ownership and assignment of the Articles, and only for such limited purposes. Without limiting the foregoing, CME has the right to edit the Articles as it deems appropriate for publication or use in accordance with the rights granted by Writer herein, and that Writer will cooperate with CME in editing, fact

checking and otherwise reviewing the Articles prior to publication. Writer will be credited as the original author of the Article in any and every republication. Writer acknowledges and understands that at no time shall Writer have any right to block publication of an Article provided that CME removes Writer's name from said Article.

10. **Miscellaneous:** This Agreement will be governed by and under the laws of the State of California without regard to its conflicts of laws provisions. This Agreement may be modified only by a written amendment executed by Writer and a duly authorized officer of CME. Any failure by either party to enforce any of the provisions of this Agreement will not be construed as a waiver of such provisions or the right of a party thereafter to enforce each and every such provision. This Agreement constitutes the complete and exclusive statement of the agreement between the parties and supersedes all proposals, oral or written, and all other communications between the parties relating to the subject matter of this Agreement.

**CME Resource has not received commercial support for the development of this article. CME Resource is obligated to ensure that potential and/or real conflicts of interest of faculty and their immediate family are identified and resolved to preserve the integrity of the content presented.**

11. **Disclosure:** Writer agrees to list below all affiliations with or financial involvement within the last twelve (12) months in any organization or entity with a direct financial interest in the subject matter or materials of the research discussed. Writer also agrees to list below all unlabeled or investigational use of commercial products to be discussed in the article. Refusal to disclose will result in disqualification.

A. Will your article include discussion of any commercial products or services?
Yes ______ No __✓__ (If No, skip to question B.)

If Yes, in the last twelve (12) months have you or members of your immediate family (spouse or partner) had any relevant financial interest or other relationship with the manufacturer(s) of any of the products or provider(s) of any of the services you intend to cover? ***A relevant financial interest or relationship*** *is defined as benefiting by receiving a salary, royalty, intellectual property rights, consulting fee, honoraria, ownership interest (e.g., stocks, stock options or other ownership interest* ***in any amount****, excluding diversified mutual funds) or other financial benefit (e.g., employment, management position, independent contractor including contracted research, consulting, speaking and teaching, membership on advisory committees or review panels, board membership, and other activities from which remuneration is received, or expected).*
Yes ______ No ______

If Yes, please list the manufacturer(s) or provider(s) and describe the nature of the relationship(s).

_______________________________________________

_______________________________________________

B. Do you anticipate your article will include discussion of unlabeled use of commercial products? *(Commercial product does not have an FDA-approval indication for the use you will be discussing.)*
Yes______ No__✓___

Name of commercial product: ______________________________
Unlabeled use to be discussed: ______________________________
_______________________________________________

Name of commercial product: ______________________________
Unlabeled use to be discussed: ______________________________
_______________________________________________

C. Do you anticipate your article will include discussion of investigational use of commercial products? *(Commercial product is not approved by the FDA for any purpose.)*
Yes______ No__✓___

Name of commercial product: ______________________________
Investigational use to be discussed: ___________________________
_______________________________________________

Name of commercial product: ______________________________
Investigational use to be discussed: ___________________________
_______________________________________________

12. If any images are included in an Article, Writer agrees not to edit, modify, or falsify such images.

13. The course completion date of this project is: **March 31, 2013**. On this date, **CME Resource** must physically have all units of **Traumatic Brain Injury**.

This contract becomes null and void if not received by **CME Resource** by **September 27, 2012**. If there are any addendums or special requirements **Jassin Jouria, Jr., MD** desires of this contract, they must be submitted in writing to **CME Resource** prior to this date and a revised contract issued.

This Agreement is entered into on this 24 day of August 2012.

**Writer**

Jassin Jouria, Jr., MD

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
[WRITER'S SOCIAL SECURITY #]

**CME Resource**

By: 

Name: **SARAH CAMPBELL**

Title: **DIRECTOR OF DEVELOPMENT**

## Attachment 1

Subjects on which CME may accept Articles from Writer:

<u>Traumatic Brain Injury</u>

CME RESOURCE
Continuing Medical Education

This Freelance Writer Agreement (the "***Agreement***") is entered into by **Jassin Jouria, Jr., MD** ("***Writer***"), and CME Resource ("***CME***").

In consideration of the mutual covenants made herein, the parties agree as follows:

1. **Parties:** Writer is engaged in the business of writing articles and other materials on a freelance basis. CME is engaged in the business of the publication of continuing education materials for medical, nursing, dental and other practitioners.

2. **Relationship:** The parties expressly agree and acknowledge that the relationship created by this Agreement is one of independent contractor. CME is not the employer of Writer, and Writer is not, and will not be treated as, an employee of CME for federal tax purposes, or any other purpose.

3. **Contract Period:** This Agreement will begin on the date set forth below and shall continue until terminated as provided herein. If either party violates a term of this Agreement, then the other party (the "***Nonbreaching Party***") may terminate this Agreement, effective immediately upon delivery of written notice of termination by the Nonbreaching Party. Notwithstanding the foregoing, CME may terminate this Agreement at any time, with or without cause, effective upon thirty (30) days written notice.

4. **Services to be Provided by Writer:** Writer agrees to submit, on his or her sole initiative or at the request of CME, written articles to CME on the subjects and in such format and at such times as set forth in Attachment 1 (the "Articles"). Attachment 1 may be revised from time to time by mutual written agreement between parties.

5. **Representations and Warranties of Writer:** By submitting an Article to CME, Writer represents and warrants the following: (a) the Article is accurate and is Writer's original work, (b) the Article has not been obtained by unlawful means and is not owned by any third party, (c) Writer has not submitted the Article to any other party for publication nor has the Article been previously published in any manner or medium, specifically including but not limited to, print or electronic medium, (d) Writer will not submit the Article to any other party for publication unless and until CME expressly rejects the Article, and (e) the Article by CME will not infringe or violate any copyright or other intellectual property right, privacy rights, publicity rights or any other rights of any third party.

POST OFFICE BOX 997571 • SACRAMENTO, CALIFORNIA 95899-7571
1482 STONE POINT DRIVE • SUITE 120 • ROSEVILLE, CALIFORNIA 95661
PHONE: 800/232-4238 • FAX: 916/783-6067 • WWW.NETCE.COM

6. **Indemnification:** Writer shall indemnify and hold harmless CME and its agents, directors, employees, licensees and affiliates from and against any claim, loss, damage, liability and expenses (including reasonable attorneys' fees and costs associated therewith) arising from any breach of any of Writer's representations or warranties contained in this Agreement. Writer shall cooperate with CME if any complaints, claims or litigation should arise regarding the Articles.

7. **Compensation:** CME agrees to pay Writer **$400** per credit per Article to be published by CME with payments not to exceed an aggregate amount of **$12000** per Article. For purposes of this Agreement, one "credit" is equal to approximately 2,000 words. Under no circumstances will Writer be paid on an hourly, daily or other basis that is a function of time. Writer acknowledges and agrees that CME will only pay writer for Articles that are approved for publication by CME, and that CME has the sole and exclusive authority and discretion to determine whether or not to approve and/or publish any and all Articles submitted by Writer.

8. **Taxes:** As an independent contractor, Writer shall be responsible for the reporting, deposit and payment of any and all federal, state, and local taxes, including but not limited to income taxes, FICA taxes, and unemployment taxes incidental to the performance of, or payment under, this Agreement.

9. **Ownership and Assignment of Intellectual Property:** Writer hereby understands and agrees that all Articles approved for publication by CME under this Agreement shall belong exclusively to CME. Without limiting the foregoing, Writer agrees that, to the maximum extent allowed by law, all such Articles shall be deemed to be "works made for hire" under all relevant copyright laws, and CME shall be deemed to be the author thereof. If and to the extent any Article is determined not to constitute "works made for hire," Writer hereby irrevocably assigns and transfers to CME and its successors and assigns all right, title, and interest in and to the Article, including all copyright rights (including but not limited to rights in audiovisual works and moral rights), patent rights, trade secret rights, trademark rights, rights of privacy and publicity, and any other intellectual property rights, and all economic rights, including, without limitation, the rights to reproduce, manufacture, use, adapt, modify, publish, distribute, sublicense, publicly perform and communicate, translate, lease, import, in each case, in any medium, and otherwise exploit the Article. Writer agrees to cooperate with and assist CME in applying for, and executing any applications and/or assignments reasonably necessary to record and evidence CME's rights in the Articles. Writer hereby appoints CME as his or her attorney-in-fact in the event that Writer does not or cannot perform his or her obligations regarding the ownership and assignment of the Articles, and only for such limited purposes. Without limiting the foregoing, CME has the right to edit the Articles as it deems appropriate for publication or use in accordance with the rights granted by Writer herein, and that Writer will cooperate with CME in editing, fact

checking and otherwise reviewing the Articles prior to publication. Writer will be credited as the original author of the Article in any and every republication. Writer acknowledges and understands that at no time shall Writer have any right to block publication of an Article provided that CME removes Writer's name from said Article.

10. **Miscellaneous:** This Agreement will be governed by and under the laws of the State of California without regard to its conflicts of laws provisions. This Agreement may be modified only by a written amendment executed by Writer and a duly authorized officer of CME. Any failure by either party to enforce any of the provisions of this Agreement will not be construed as a waiver of such provisions or the right of a party thereafter to enforce each and every such provision. This Agreement constitutes the complete and exclusive statement of the agreement between the parties and supersedes all proposals, oral or written, and all other communications between the parties relating to the subject matter of this Agreement.

**CME Resource has not received commercial support for the development of this article. CME Resource is obligated to ensure that potential and/or real conflicts of interest of faculty and their immediate family are identified and resolved to preserve the integrity of the content presented.**

11. **Disclosure:** Writer agrees to list below all affiliations with or financial involvement within the last twelve (12) months in any organization or entity with a direct financial interest in the subject matter or materials of the research discussed. Writer also agrees to list below all unlabeled or investigational use of commercial products to be discussed in the article. Refusal to disclose will result in disqualification.

A. Will your article include discussion of any commercial products or services?
Yes ______ No ✓ ______ (If No, skip to question B.)

If Yes, in the last twelve (12) months have you or members of your immediate family (spouse or partner) had any relevant financial interest or other relationship with the manufacturer(s) of any of the products or provider(s) of any of the services you intend to cover? ***A relevant financial interest or relationship*** *is defined as benefiting by receiving a salary, royalty, intellectual property rights, consulting fee, honoraria, ownership interest (e.g., stocks, stock options or other ownership interest* ***in any amount****, excluding diversified mutual funds) or other financial benefit (e.g., employment, management position, independent contractor including contracted research, consulting, speaking and teaching, membership on advisory committees or review panels, board membership, and other activities from which remuneration is received, or expected).*
Yes ______ No ______

MD

If Yes, please list the manufacturer(s) or provider(s) and describe the nature of the relationship(s).

_______________________________________________

_______________________________________________

B. Do you anticipate your article will include discussion of unlabeled use of commercial products? *(Commercial product does not have an FDA-approval indication for the use you will be discussing.)*
Yes______ No__✓__

Name of commercial product: ______________________
Unlabeled use to be discussed: ______________________
_______________________________________________

Name of commercial product: ______________________
Unlabeled use to be discussed: ______________________
_______________________________________________

C. Do you anticipate your article will include discussion of investigational use of commercial products? *(Commercial product is not approved by the FDA for any purpose.)*
Yes______ No__✓__

Name of commercial product: ______________________
Investigational use to be discussed: ______________________
_______________________________________________

Name of commercial product: ______________________
Investigational use to be discussed: ______________________
_______________________________________________

12. If any images are included in an Article, Writer agrees not to edit, modify, or falsify such images.

13. The course completion date of this project is: **December 31, 2013**. On this date, **CME Resource** must physically have all units of **Cancer and Chemotherapy**.

This contract becomes null and void if not received by **CME Resource** by **January 31, 2013**. If there are any addendums or special requirements **Jassin Jouria, Jr., MD** desires of this contract, they must be submitted in writing to **CME Resource** prior to this date and a revised contract issued.

This Agreement is entered into on this 15th day of January 2013.

**Writer**

Jassin Jouria, Jr., MD

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

[WRITER'S SOCIAL SECURITY #]

**CME Resource**

By: ____________________

Name: **SARAH CAMPBELL**

Title: **DIRECTOR OF DEVELOPMENT**

## Attachment 1

Subjects on which CME may accept Articles from Writer:

<u>Cancer and Chemotherapy</u>

Form **W-9**
(Rev. December 2011)
Department of the Treasury
Internal Revenue Service

# Request for Taxpayer Identification Number and Certification

**Give Form to the requester. Do not send to the IRS.**

Print or type — See Specific Instructions on page 2.

Name (as shown on your income tax return)
JASSIN M. JOURIA, JR.

Business name/disregarded entity name, if different from above

Check appropriate box for federal tax classification:
☑ Individual/sole proprietor ☐ C Corporation ☐ S Corporation ☐ Partnership ☐ Trust/estate

☐ Limited liability company. Enter the tax classification (C=C corporation, S=S corporation, P=partnership) ▶

☐ Exempt payee

☐ Other (see instructions) ▶

Address (number, street, and apt. or suite no.)
2648 N. 26TH TER.

Requester's name and address (optional)

City, state, and ZIP code
Hollywood, FL 33020

List account number(s) here (optional)

## Part I Taxpayer Identification Number (TIN)

Enter your TIN in the appropriate box. The TIN provided must match the name given on the "Name" line to avoid backup withholding. For individuals, this is your social security number (SSN). However, for a resident alien, sole proprietor, or disregarded entity, see the Part I instructions on page 3. For other entities, it is your employer identification number (EIN). If you do not have a number, see *How to get a TIN* on page 3.

**Note.** If the account is in more than one name, see the chart on page 4 for guidelines on whose number to enter.

Social security number
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

Employer identification number
__ - _______

## Part II Certification

Under penalties of perjury, I certify that:

1. The number shown on this form is my correct taxpayer identification number (or I am waiting for a number to be issued to me), and
2. I am not subject to backup withholding because: (a) I am exempt from backup withholding, or (b) I have not been notified by the Internal Revenue Service (IRS) that I am subject to backup withholding as a result of a failure to report all interest or dividends, or (c) the IRS has notified me that I am no longer subject to backup withholding, and
3. I am a U.S. citizen or other U.S. person (defined below).

**Certification instructions.** You must cross out item 2 above if you have been notified by the IRS that you are currently subject to backup withholding because you have failed to report all interest and dividends on your tax return. For real estate transactions, item 2 does not apply. For mortgage interest paid, acquisition or abandonment of secured property, cancellation of debt, contributions to an individual retirement arrangement (IRA), and generally, payments other than interest and dividends, you are not required to sign the certification, but you must provide your correct TIN. See the instructions on page 4.

**Sign Here** Signature of U.S. person ▶ [signature] Date ▶ 01/15/2013

## General Instructions

Section references are to the Internal Revenue Code unless otherwise noted.

## Purpose of Form

A person who is required to file an information return with the IRS must obtain your correct taxpayer identification number (TIN) to report, for example, income paid to you, real estate transactions, mortgage interest you paid, acquisition or abandonment of secured property, cancellation of debt, or contributions you made to an IRA.

Use Form W-9 only if you are a U.S. person (including a resident alien), to provide your correct TIN to the person requesting it (the requester) and, when applicable, to:

1. Certify that the TIN you are giving is correct (or you are waiting for a number to be issued),
2. Certify that you are not subject to backup withholding, or
3. Claim exemption from backup withholding if you are a U.S. exempt payee. If applicable, you are also certifying that as a U.S. person, your allocable share of any partnership income from a U.S. trade or business is not subject to the withholding tax on foreign partners' share of effectively connected income.

**Note.** If a requester gives you a form other than Form W-9 to request your TIN, you must use the requester's form if it is substantially similar to this Form W-9.

**Definition of a U.S. person.** For federal tax purposes, you are considered a U.S. person if you are:

- An individual who is a U.S. citizen or U.S. resident alien,
- A partnership, corporation, company, or association created or organized in the United States or under the laws of the United States,
- An estate (other than a foreign estate), or
- A domestic trust (as defined in Regulations section 301.7701-7).

**Special rules for partnerships.** Partnerships that conduct a trade or business in the United States are generally required to pay a withholding tax on any foreign partners' share of income from such business. Further, in certain cases where a Form W-9 has not been received, a partnership is required to presume that a partner is a foreign person, and pay the withholding tax. Therefore, if you are a U.S. person that is a partner in a partnership conducting a trade or business in the United States, provide Form W-9 to the partnership to establish your U.S. status and avoid withholding on your share of partnership income.

This Freelance Writer Agreement (the "*Agreement*") is entered into by **Jassin Jouria, Jr. MD** ("***Writer***"), and CME Resource ("***CME***").

In consideration of the mutual covenants made herein, the parties agree as follows:

1. **Parties:** Writer is engaged in the business of writing articles and other materials on a freelance basis. CME is engaged in the business of the publication of continuing education materials for medical, nursing, dental and other practitioners.

2. **Relationship:** The parties expressly agree and acknowledge that the relationship created by this Agreement is one of independent contractor. CME is not the employer of Writer, and Writer is not, and will not be treated as, an employee of CME for federal tax purposes, or any other purpose.

3. **Contract Period:** This Agreement will begin on the date set forth below and shall continue until terminated as provided herein. If either party violates a term of this Agreement, then the other party (the "***Nonbreaching Party***") may terminate this Agreement, effective immediately upon delivery of written notice of termination by the Nonbreaching Party. Notwithstanding the foregoing, CME may terminate this Agreement at any time, with or without cause, effective upon thirty (30) days written notice.

4. **Services to be Provided by Writer:** Writer agrees to submit, on his or her sole initiative or at the request of CME, written articles to CME on the subjects and in such format and at such times as set forth in Attachment 1 (the "Articles"). Attachment 1 may be revised from time to time by mutual written agreement between parties.

5. **Representations and Warranties of Writer:** By submitting an Article to CME, Writer represents and warrants the following: (a) the Article is accurate and is Writer's original work, (b) the Article has not been obtained by unlawful means and is not owned by any third party, (c) Writer has not submitted the Article to any other party for publication nor has the Article been previously published in any manner or medium, specifically including but not limited to, print or electronic medium, (d) Writer will not submit the Article to any other party for publication unless and until CME expressly rejects the Article, and (e) the Article by CME will not infringe or violate any copyright or other intellectual property right, privacy rights, publicity rights or any other rights of any third party.

6. **Indemnification:** Writer shall indemnify and hold harmless CME and its agents, directors, employees, licensees and affiliates from and against any claim, loss, damage, liability and expenses (including reasonable attorneys' fees and costs associated therewith) arising from any breach of any of Writer's representations or warranties contained in this Agreement. Writer shall cooperate with CME if any complaints, claims or litigation should arise regarding the Articles.

7. **Compensation:** CME agrees to pay Writer **$400** per credit per Article to be published by CME with payments not to exceed an aggregate amount of **$10000** per Article. For purposes of this Agreement, one "credit" is equal to approximately 2,000 words. Under no circumstances will Writer be paid on an hourly, daily or other basis that is a function of time. Writer acknowledges and agrees that CME will only pay writer for Articles that are approved for publication by CME, and that CME has the sole and exclusive authority and discretion to determine whether or not to approve and/or publish any and all Articles submitted by Writer.

8. **Taxes:** As an independent contractor, Writer shall be responsible for the reporting, deposit and payment of any and all federal, state, and local taxes, including but not limited to income taxes, FICA taxes, and unemployment taxes incidental to the performance of, or payment under, this Agreement.

9. **Ownership and Assignment of Intellectual Property:** Writer hereby understands and agrees that all Articles approved for publication by CME under this Agreement shall belong exclusively to CME. Without limiting the foregoing, Writer agrees that, to the maximum extent allowed by law, all such Articles shall be deemed to be "works made for hire" under all relevant copyright laws, and CME shall be deemed to be the author thereof. If and to the extent any Article is determined not to constitute "works made for hire," Writer hereby irrevocably assigns and transfers to CME and its successors and assigns all right, title, and interest in and to the Article, including all copyright rights (including but not limited to rights in audiovisual works and moral rights), patent rights, trade secret rights, trademark rights, rights of privacy and publicity, and any other intellectual property rights, and all economic rights, including, without limitation, the rights to reproduce, manufacture, use, adapt, modify, publish, distribute, sublicense, publicly perform and communicate, translate, lease, import, in each case, in any medium, and otherwise exploit the Article. Writer agrees to cooperate with and assist CME in applying for, and executing any applications and/or assignments reasonably necessary to record and evidence CME's rights in the Articles. Writer hereby appoints CME as his or her attorney-in-fact in the event that Writer does not or cannot perform his or her obligations regarding the ownership and assignment of the Articles, and only for such limited purposes. Without limiting the foregoing, CME has the right to edit the Articles as it deems appropriate for publication or use in accordance with the rights granted by Writer herein, and that Writer will cooperate with CME in editing, fact

checking and otherwise reviewing the Articles prior to publication. Writer will be credited as the original author of the Article in any and every republication. Writer acknowledges and understands that at no time shall Writer have any right to block publication of an Article provided that CME removes Writer's name from said Article.

10. **Miscellaneous:** This Agreement will be governed by and under the laws of the State of California without regard to its conflicts of laws provisions. This Agreement may be modified only by a written amendment executed by Writer and a duly authorized officer of CME. Any failure by either party to enforce any of the provisions of this Agreement will not be construed as a waiver of such provisions or the right of a party thereafter to enforce each and every such provision. This Agreement constitutes the complete and exclusive statement of the agreement between the parties and supersedes all proposals, oral or written, and all other communications between the parties relating to the subject matter of this Agreement.

**CME Resource has not received commercial support for the development of this article. CME Resource is obligated to ensure that potential and/or real conflicts of interest of faculty and their immediate family are identified and resolved to preserve the integrity of the content presented.**

11. **Disclosure:** Writer agrees to list below all affiliations with or financial involvement within the last twelve (12) months in any organization or entity with a direct financial interest in the subject matter or materials of the research discussed. Writer also agrees to list below all unlabeled or investigational use of commercial products to be discussed in the article. Refusal to disclose will result in disqualification.

A. Will your article include discussion of any commercial products or services?
Yes ______ No __✓__ (If No, skip to question B.)

If Yes, in the last twelve (12) months have you or members of your immediate family (spouse or partner) had any relevant financial interest or other relationship with the manufacturer(s) of any of the products or provider(s) of any of the services you intend to cover? ***A relevant financial interest or relationship*** *is defined as benefiting by receiving a salary, royalty, intellectual property rights, consulting fee, honoraria, ownership interest (e.g., stocks, stock options or other ownership interest* ***in any amount,*** *excluding diversified mutual funds) or other financial benefit (e.g., employment, management position, independent contractor including contracted research, consulting, speaking and teaching, membership on advisory committees or review panels, board membership, and other activities from which remuneration is received, or expected).*
Yes ______ No __✓__

If Yes, please list the manufacturer(s) or provider(s) and describe the nature of the relationship(s).

______________________________________________

______________________________________________

B. Do you anticipate your article will include discussion of unlabeled use of commercial products? *(Commercial product does not have an FDA-approval indication for the use you will be discussing.)*
Yes______ No__✓__

Name of commercial product: ____________________
Unlabeled use to be discussed: ____________________
______________________________________________

Name of commercial product: ____________________
Unlabeled use to be discussed: ____________________
______________________________________________

C. Do you anticipate your article will include discussion of investigational use of commercial products? *(Commercial product is not approved by the FDA for any purpose.)*
Yes______ No__✓__

Name of commercial product: ____________________
Investigational use to be discussed: ____________________
______________________________________________

Name of commercial product: ____________________
Investigational use to be discussed: ____________________
______________________________________________

12. If any images are included in an Article, Writer agrees not to edit, modify, or falsify such images.

13. The course completion date of this project is: **July 31, 2013**. On this date, **CME Resource** must physically have all units of **Clinical Cardiovascular Pharmacology**.

This contract becomes null and void if not received by **CME Resource** by **October 31, 2012**. If there are any addendums or special requirements **Jassin Jouria, Jr. MD** desires of this contract, they must be submitted in writing to **CME Resource** prior to this date and a revised contract issued.

This Agreement is entered into on this 17th day of OCTOBER 2012.

**Writer**

Jassin Jouria, Jr. MD

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
[WRITER'S SOCIAL SECURITY #]

**CME Resource**

By: scampbell

Name: **SARAH CAMPBELL**

Title: **DIRECTOR OF DEVELOPMENT**

CME
RESOURCE
Continuing Medical Education

This Freelance Writer Agreement (the "***Agreement***") is entered into by **Jassin Jouria, Jr., MD** ("***Writer***"), and CME Resource ("***CME***").

In consideration of the mutual covenants made herein, the parties agree as follows:

1. **Parties:** Writer is engaged in the business of writing articles and other materials on a freelance basis. CME is engaged in the business of the publication of continuing education materials for medical, nursing, dental and other practitioners.

2. **Relationship:** The parties expressly agree and acknowledge that the relationship created by this Agreement is one of independent contractor. CME is not the employer of Writer, and Writer is not, and will not be treated as, an employee of CME for federal tax purposes, or any other purpose.

3. **Contract Period:** This Agreement will begin on the date set forth below and shall continue until terminated as provided herein. If either party violates a term of this Agreement, then the other party (the "***Nonbreaching Party***") may terminate this Agreement, effective immediately upon delivery of written notice of termination by the Nonbreaching Party. Notwithstanding the foregoing, CME may terminate this Agreement at any time, with or without cause, effective upon thirty (30) days written notice.

4. **Services to be Provided by Writer:** Writer agrees to submit, on his or her sole initiative or at the request of CME, written articles to CME on the subjects and in such format and at such times as set forth in Attachment 1 (the "Articles"). Attachment 1 may be revised from time to time by mutual written agreement between parties.

5. **Representations and Warranties of Writer:** By submitting an Article to CME, Writer represents and warrants the following: (a) the Article is accurate and is Writer's original work, (b) the Article has not been obtained by unlawful means and is not owned by any third party, (c) Writer has not submitted the Article to any other party for publication nor has the Article been previously published in any manner or medium, specifically including but not limited to, print or electronic medium, (d) Writer will not submit the Article to any other party for publication unless and until CME expressly rejects the Article, and (e) the Article by CME will not infringe or violate any copyright or other intellectual property right, privacy rights, publicity rights or any other rights of any third party.

POST OFFICE BOX 997571 • SACRAMENTO, CALIFORNIA 95899-7571
1482 STONE POINT DRIVE • SUITE 120 • ROSEVILLE, CALIFORNIA 95661
PHONE: 800/232-4238 • FAX: 916/783-6067 • WWW.NETCE.COM

6. **Indemnification:** Writer shall indemnify and hold harmless CME and its agents, directors, employees, licensees and affiliates from and against any claim, loss, damage, liability and expenses (including reasonable attorneys' fees and costs associated therewith) arising from any breach of any of Writer's representations or warranties contained in this Agreement. Writer shall cooperate with CME if any complaints, claims or litigation should arise regarding the Articles.

7. **Compensation:** CME agrees to pay Writer **$400** per credit per Article to be published by CME with payments not to exceed an aggregate amount of **$4000** per Article. For purposes of this Agreement, one "credit" is equal to approximately 2,000 words. Under no circumstances will Writer be paid on an hourly, daily or other basis that is a function of time. Writer acknowledges and agrees that CME will only pay writer for Articles that are approved for publication by CME, and that CME has the sole and exclusive authority and discretion to determine whether or not to approve and/or publish any and all Articles submitted by Writer.

8. **Taxes:** As an independent contractor, Writer shall be responsible for the reporting, deposit and payment of any and all federal, state, and local taxes, including but not limited to income taxes, FICA taxes, and unemployment taxes incidental to the performance of, or payment under, this Agreement.

9. **Ownership and Assignment of Intellectual Property:** Writer hereby understands and agrees that all Articles approved for publication by CME under this Agreement shall belong exclusively to CME. Without limiting the foregoing, Writer agrees that, to the maximum extent allowed by law, all such Articles shall be deemed to be "works made for hire" under all relevant copyright laws, and CME shall be deemed to be the author thereof. If and to the extent any Article is determined not to constitute "works made for hire," Writer hereby irrevocably assigns and transfers to CME and its successors and assigns all right, title, and interest in and to the Article, including all copyright rights (including but not limited to rights in audiovisual works and moral rights), patent rights, trade secret rights, trademark rights, rights of privacy and publicity, and any other intellectual property rights, and all economic rights, including, without limitation, the rights to reproduce, manufacture, use, adapt, modify, publish, distribute, sublicense, publicly perform and communicate, translate, lease, import, in each case, in any medium, and otherwise exploit the Article. Writer agrees to cooperate with and assist CME in applying for, and executing any applications and/or assignments reasonably necessary to record and evidence CME's rights in the Articles. Writer hereby appoints CME as his or her attorney-in-fact in the event that Writer does not or cannot perform his or her obligations regarding the ownership and assignment of the Articles, and only for such limited purposes. Without limiting the foregoing, CME has the right to edit the Articles as it deems appropriate for publication or use in accordance with the rights granted by Writer herein, and that Writer will cooperate with CME in editing, fact

checking and otherwise reviewing the Articles prior to publication. Writer will be credited as the original author of the Article in any and every republication. Writer acknowledges and understands that at no time shall Writer have any right to block publication of an Article provided that CME removes Writer's name from said Article.

10. **Miscellaneous:** This Agreement will be governed by and under the laws of the State of California without regard to its conflicts of laws provisions. This Agreement may be modified only by a written amendment executed by Writer and a duly authorized officer of CME. Any failure by either party to enforce any of the provisions of this Agreement will not be construed as a waiver of such provisions or the right of a party thereafter to enforce each and every such provision. This Agreement constitutes the complete and exclusive statement of the agreement between the parties and supersedes all proposals, oral or written, and all other communications between the parties relating to the subject matter of this Agreement.

**CME Resource has not received commercial support for the development of this article. CME Resource is obligated to ensure that potential and/or real conflicts of interest of faculty and their immediate family are identified and resolved to preserve the integrity of the content presented.**

11. **Disclosure:** Writer agrees to list below all affiliations with or financial involvement within the last twelve (12) months in any organization or entity with a direct financial interest in the subject matter or materials of the research discussed. Writer also agrees to list below all unlabeled or investigational use of commercial products to be discussed in the article. Refusal to disclose will result in disqualification.

A. Will your article include discussion of any commercial products or services?
Yes ______ No __√__ (If No, skip to question B.)

If Yes, in the last twelve (12) months have you or members of your immediate family (spouse or partner) had any relevant financial interest or other relationship with the manufacturer(s) of any of the products or provider(s) of any of the services you intend to cover? ***A relevant financial interest or relationship*** *is defined as benefiting by receiving a salary, royalty, intellectual property rights, consulting fee, honoraria, ownership interest (e.g., stocks, stock options or other ownership interest* ***in any amount****, excluding diversified mutual funds) or other financial benefit (e.g., employment, management position, independent contractor including contracted research, consulting, speaking and teaching, membership on advisory committees or review panels, board membership, and other activities from which remuneration is received, or expected).*
Yes ______ No __√__

AD

If Yes, please list the manufacturer(s) or provider(s) and describe the nature of the relationship(s).

______________________________________________

______________________________________________

B. Do you anticipate your article will include discussion of unlabeled use of commercial products? *(Commercial product does not have an FDA-approval indication for the use you will be discussing.)*
Yes______ No__✓__

Name of commercial product: ______________________
Unlabeled use to be discussed: ______________________
______________________________________________

Name of commercial product: ______________________
Unlabeled use to be discussed: ______________________
______________________________________________

C. Do you anticipate your article will include discussion of investigational use of commercial products? *(Commercial product is not approved by the FDA for any purpose.)*
Yes______ No__✓__

Name of commercial product: ______________________
Investigational use to be discussed: ______________________
______________________________________________

Name of commercial product: ______________________
Investigational use to be discussed: ______________________
______________________________________________

12. If any images are included in an Article, Writer agrees not to edit, modify, or falsify such images.

13. The course completion date of this project is: **December 31, 2013**. On this date, **CME Resource** must physically have all units of **Gastroesophageal Reflux Disease**.

This contract becomes null and void if not received by **CME Resource** by **January 31, 2013**. If there are any addendums or special requirements **Jassin Jouria, Jr., MD** desires of this contract, they must be submitted in writing to **CME Resource** prior to this date and a revised contract issued.

This Agreement is entered into on this 15th day of January 2013.

**Writer**

Jassim Jouria, Jr., MD

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
[WRITER'S SOCIAL SECURITY #]

**CME Resource**

By:

Name: **SARAH CAMPBELL**

Title: **DIRECTOR OF DEVELOPMENT**

## Attachment 1

Subjects on which CME may accept Articles from Writer:

<u>Gastroesophageal Reflux Disease</u>

Form **W-9**
(Rev. December 2011)
Department of the Treasury
Internal Revenue Service

# Request for Taxpayer Identification Number and Certification

**Give Form to the requester. Do not send to the IRS.**

Print or type
See Specific Instructions on page 2.

Name (as shown on your income tax return)
JASSIN M. JOURIA, JR.

Business name/disregarded entity name, if different from above

Check appropriate box for federal tax classification:
☑ Individual/sole proprietor ☐ C Corporation ☐ S Corporation ☐ Partnership ☐ Trust/estate

☐ Limited liability company. Enter the tax classification (C=C corporation, S=S corporation, P=partnership) ▶

☐ Exempt payee

☐ Other (see instructions) ▶

Address (number, street, and apt. or suite no.)
2648 N. 26TH TER.

Requester's name and address (optional)

City, state, and ZIP code
Hollywood, FL 33020

List account number(s) here (optional)

## Part I Taxpayer Identification Number (TIN)

Enter your TIN in the appropriate box. The TIN provided must match the name given on the "Name" line to avoid backup withholding. For individuals, this is your social security number (SSN). However, for a resident alien, sole proprietor, or disregarded entity, see the Part I instructions on page 3. For other entities, it is your employer identification number (EIN). If you do not have a number, see *How to get a TIN* on page 3.

**Note.** If the account is in more than one name, see the chart on page 4 for guidelines on whose number to enter.

Social security number
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

Employer identification number
–

## Part II Certification

Under penalties of perjury, I certify that:

1. The number shown on this form is my correct taxpayer identification number (or I am waiting for a number to be issued to me), and
2. I am not subject to backup withholding because: (a) I am exempt from backup withholding, or (b) I have not been notified by the Internal Revenue Service (IRS) that I am subject to backup withholding as a result of a failure to report all interest or dividends, or (c) the IRS has notified me that I am no longer subject to backup withholding, and
3. I am a U.S. citizen or other U.S. person (defined below).

**Certification instructions.** You must cross out item 2 above if you have been notified by the IRS that you are currently subject to backup withholding because you have failed to report all interest and dividends on your tax return. For real estate transactions, item 2 does not apply. For mortgage interest paid, acquisition or abandonment of secured property, cancellation of debt, contributions to an individual retirement arrangement (IRA), and generally, payments other than interest and dividends, you are not required to sign the certification, but you must provide your correct TIN. See the instructions on page 4.

**Sign Here** | **Signature of U.S. person** ▶ [signature] | **Date** ▶ 01/15/2013

## General Instructions

Section references are to the Internal Revenue Code unless otherwise noted.

## Purpose of Form

A person who is required to file an information return with the IRS must obtain your correct taxpayer identification number (TIN) to report, for example, income paid to you, real estate transactions, mortgage interest you paid, acquisition or abandonment of secured property, cancellation of debt, or contributions you made to an IRA.

Use Form W-9 only if you are a U.S. person (including a resident alien), to provide your correct TIN to the person requesting it (the requester) and, when applicable, to:

1. Certify that the TIN you are giving is correct (or you are waiting for a number to be issued),

2. Certify that you are not subject to backup withholding, or

3. Claim exemption from backup withholding if you are a U.S. exempt payee. If applicable, you are also certifying that as a U.S. person, your allocable share of any partnership income from a U.S. trade or business is not subject to the withholding tax on foreign partners' share of effectively connected income.

**Note.** If a requester gives you a form other than Form W-9 to request your TIN, you must use the requester's form if it is substantially similar to this Form W-9.

**Definition of a U.S. person.** For federal tax purposes, you are considered a U.S. person if you are:

- An individual who is a U.S. citizen or U.S. resident alien,
- A partnership, corporation, company, or association created or organized in the United States or under the laws of the United States,
- An estate (other than a foreign estate), or
- A domestic trust (as defined in Regulations section 301.7701-7).

**Special rules for partnerships.** Partnerships that conduct a trade or business in the United States are generally required to pay a withholding tax on any foreign partners' share of income from such business. Further, in certain cases where a Form W-9 has not been received, a partnership is required to presume that a partner is a foreign person, and pay the withholding tax. Therefore, if you are a U.S. person that is a partner in a partnership conducting a trade or business in the United States, provide Form W-9 to the partnership to establish your U.S. status and avoid withholding on your share of partnership income.